**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**J. L. PATTERSON, Jr.,**
**Defendant-Appellant.**

No. 75–3143
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

March 18, 1976.

---

* Rule 18, 5 Cir., see *Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al.*, 5 Cir., 1970, 431 F.2d 409.

Joe Doucette, Houston, Tex., Gerald M. Birnberg, Bellaire, Tex., for defendant-appellant.

John Clark, U. S. Atty., Wayne F. Speck, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before COLEMAN, GOLDBERG and GEE, Circuit Judges.

PER CURIAM:

J. L. Patterson, Jr., appeals from his conviction and sentence on three counts of violating 18 U.S.C., § 1343, fraud by wire. He assigns five separate errors on appeal. As will be discussed herein, none warrant reversal of his conviction.

This case involves the use of an electronic device commonly referred to as a "blue box". The device enables a person to by-pass the regular electronic circuitry used by the telephone companies for recording and billing calls for which a toll is charged. By use of a "blue box", a person can call virtually any telephone number in the world and not be charged for the call. The devices have been a source of concern for the telephone companies and law enforcement officials, as well as the subject of recent publicity.[1]

---

1. *Wall Street Journal*, January 29, 1976, page 1.

# HE WALL STREET JOURNA

© 1976 Dow Jones & Company, Inc. All Rights Reserved.

SOUTHWEST EDITION

## THURSDAY, JANUARY 29, 1976

## Blue Boxes Spread From Phone Freaks To the Well-Heeled

• • •

### Singer Admits, Actor Denies Cheating on Long Distance: The Hekimian-Printout Bit

By SANFORD L JACOBS
*Staff Reporter of* THE WALL STREET JOURNAL

Singer Lainie Kazan did it, and the phone company caught her. Actor Bob Cummings says he didn't do it, but telephone-company detectives and the police say they caught him red-handed. People you never heard of have done it, too, though it's illegal, and they probably consider themselves basically honest.

"It" is using a small, lightweight device called a "blue box" to avoid paying for long-distance phone calls. Blue boxes, portable noisemakers that make highly specialized noises, aren't new. The first one showed up about 14 years ago. But for years they were used mostly by electronics tinkerers who got a charge out of things like reaching the recorded weather report for Tokyo without paying for the call. Blue-box users came to be known in some underground circles as "phone freaks" or "phreaks."

Today, however, the phone company says, businessmen, doctors, brokers and entertainers use the illegal devices. "More and more in recent years we've found people of substance," says William Caming, an American Telephone & Telegraph Co. attorney specializing in security matters. AT&T can't be sure just how much the blue-box cheaters cost the company, but Mr. Caming estimates the losses at $10 million to $20 million a year

### Fair Game

Why are otherwise law-abiding people attracted to the devices? John E Miller, New York Telephone Co.'s general security manager, says the reason is a combination of greed and "the attitude that it's all right to rip off the phone company."

Anyone with a basic grasp of electronics can make a blue box, using parts available in most audio-equipment stores. But business and professional people caught with blue boxes have generally bought them, from underground sources. "Some have sold for as much as $3,500 each," Mr Caming says. According to AT&T detectives, the usual price is $800 to $1,000.

One blue-box manufacturing and distribution operation, based in Minneapolis, was smashed three years ago before it really got going Agents of the Federal Bureau of Investigation and detectives of the Bell System raided locations in Dallas, Houston, Chicago and Cleveland that had been set up to market the devices nationwide

Some blue boxes confiscated by New York Telephone are compact enough to slip easily into a sport-jacket pocket. The device has 13 buttons, each producing a different tone. They are the same tones produced when long-distance operators place calls: 10 tones for digits 0 through 9, one tone that "tells" long-distance switching equipment that the line is clear, one tone signaling that dialing is about to begin, and one tone signaling that dialing has been completed.

The key to which tones represent what, and how the long-distance system uses them, appeared in 1960 in an AT&T technical publication available in hundreds of college libraries.

### Seizing a Circuit

To make a blue-box call, a cheater first dials a toll-free number; an 800 number or an out-of-town operator. When the called phone is answered, he picks up his blue box and pushes the clear-line tone. When that tone enters the mouthpiece, it disconnects the called phone but leaves the circuit open for calling any phone reachable by direct dialing. The circuit thus seized, the cheater proceeds with the other tones, dialing about to start, the number, dialing completed. Since it's the tone that counts, the cheater doesn't need the blue box itself; he can use tape-recordings of the various tones.

The call won't show up on his phone bill because AT&T's billing equipment considers it a toll-free call. But the call is logged by a phone-company computer, as all calls are AT&T programs computers to print separate lists of toll-free calls lasting longer than the usual time for these calls; the printouts, which list all such calls from a given city, include the number of the phone making the call.

Studying these printouts is the main way AT&T detectives spot blue-box users. But some long-winded toll-free calls are legitimate, says Mr. Miller, the New York Telephone Co security manager, so a lot of checking has to be done. If a suspicious calling pattern emerges, a device called a Hekimian Dialed Number Recorder, named for its manufacturer, Hekimian Laboratories Inc of Rockville, Md , is placed on the suspect's phone line. It prints each number called and distinguishes between a plain phone call and a blue-box call If blue-box calls show up, the next step is a search warrant.

It was a Hekimian printout that suggested that Bob Cummings used a blue box in an apartment he occupied in Seattle for several weeks while appearing in a play there. Last Dec. 16, police and Bell security agents, armed with a search warrant, burst into the apartment and, they allege, caught the actor holding a blue box. He has been

charged with two misdemeanors and faces a year in jail and a $1,000 fine He has pleaded innocent and is free on his promise to appear for trial, which is set for March 1.

Lainie Kazan, the singer, pleaded guilty in Los Angeles last November to a charge stemming from blue-boxing No devices were found, however, and a city prosecutor says that tape-recorded blue-box signals were probably used. Miss Kazan originally was charged with eight counts of defrauding Pacific Telephone & Telegraph Co. Subsequently she pleaded guilty to one count, paid a $440 fine, was placed on 18 months' probation and was ordered to make a $300 restitution to the phone company.

Within a single 21-hour period on Oct. 29, 1974, according to court papers, Morris Sohnen, a New York City coin dealer, made blue-box calls to Israel, Germany, Switzerland and several places in the U.S He pleaded guilty to intent to steal services, paid a $500 fine, was put on a year's probation and paid back the phone company $4,886.68

The blue box shouldn't be confused with the black box, the red box or the cheese box The black box is a device attached to a cheater's phone that enables other people to call him long-distance without charge The red box simulates the sounds made when different coins are dropped into a pay phone The cheese box, favored by such busy people as bookies, is a black box attached to a phone in another city that enables people anywhere to call the cheater long-distance free by dialing that other phone's number

Various publications have printed instructions on blue-box construction, though AT&T tries to restrain the circulation of such information. Publishers of a monthly magazine, "Amateur Radio 73," printed an article on blue-box construction last June Recently the Los Angeles Superior Court enjoined publication of further articles of this nature by the publisher, 73 Inc , and ordered that the magazine, in its next issue, carry a notice saying use of the information may be unlawful In agreeing to the judgment, the publisher didn't admit any wrongdoing.

On November 5, 1974, the appellant met with Jerry Wallace, the security supervisor for Southwestern Bell Telephone Company in San Antonio, Texas. Mr. Wallace, posing as a booking agent for musical groups, pretended to be interested in purchasing several "blue boxes" from the appellant. The meeting was arranged by James Lander, an informant, who was acquainted with the appellant in Houston, Texas. The meeting took place in San Antonio in an apartment leased by an employee of the F.B.I. While Lander was sleeping, appellant proceeded with his sales pitch to Wallace. Appellant explained that thousands of dollars could be saved by using the device. He explained to Wallace that the device was illegal and that it should be used with great caution lest someone discover it. He even cited the pertinent federal statute, 18 U.S.C., § 1343, to Wallace.

During his "sales demonstration" appellant produced several "blue boxes" and assured Wallace that he manufactured them and could supply any number of them to Wallace for the price of $3,000. He also demonstrated the proper use of the device by placing calls through Washington, D. C., and then to information operators in Tokyo, Japan; Tel Aviv, Israel; and Frankfurt, West Germany.[2] Wallace listened as each operator answered and then hung up the phone.

Another demonstration call was made from the San Antonio apartment, through Washington, D. C., and then to Wallace's own office number in San Antonio. His secretary answered the call but did not identify the office as that of Southwestern Bell.[3]

After the demonstration calls, there was some haggling over the price, and Wallace agreed to purchase four "blue boxes" from appellant. They agreed to meet again at a motel restaurant after Wallace had obtained the necessary funds. Wallace then left and reported the activities to the F.B.I.

As the demonstration calls from the apartment were being made by use of the blue box, they were recorded graphically in the telephone company's central office by a device identified as a Hekimian 51–A. The machine printed out the numbers that were dialed from the apartment telephone, indicating in red ink those that were dialed from the "blue box".[4] The printed tape from the Hekimian 51–A [5] was received into evidence, and it corroborates the testimony of Mr. Wallace.

 Appellant contends that he was "lured" into the Western District of Texas by Wallace and Lander. Wallace admitted his belief that appellant would not be adequately prosecuted in the Southern District of Texas, in his home city of Houston, because of his alleged "strong contacts" in high official places. Wallace also stated that he had no investigatory jurisdiction in Houston and that because it was his case, he needed to complete it in San Antonio. Appellant urges this issue for the first time on appeal. He did not move for a transfer of the case from the Western District to the Southern District as he could have done under Rule 21(b), F.R.Cr.P. Nor did he request instructions to the jury on entrapment, although the trial judge specifically gave him the opportunity to do so, Rule 30, F.R.Cr.P. Since the issue was not raised below, we can notice it only if it amounts to plain error, Rule 52(b), F.R.Cr.P. The actions of Lander and Wallace were in response to appellant's desire to sell "blue boxes". The creativity activity necessary for entrapment is simply not present, *United States v. Oquendo*, 5 Cir., 1974, 490 F.2d

---

2. Counts I, II, and III of the indictment, respectively.

3. This pre-arranged call was not charged in the indictment although interstate wire communication was used.

4. It is not contested that the recording machine was being used with the consent of the owner of the apartment, an F.B.I. employee.

5. Government Exhibit No. 9.

161; *United States v. Bueno*, 5 Cir., 1971, 447 F.2d 903.

■ Appellant claims that the use of the "blue box" does not violate the statute because there was no evidence that the calls made with the device were part of the scheme to defraud. The evidence is contrary. The testimony of Wallace clearly indicates that appellant had formulated a plan to defraud the telephone company. His whole sales pitch was based on that scheme. By making interstate and foreign telephone calls to demonstrate his device, federal jurisdiction is invoked. Appellant's assertion that the calls were made to information operators and, therefore, not subject to tolls is of no significance. There is no necessity for the government to prove actual financial loss, *Huff v. United States*, 5 Cir., 1962, 301 F.2d 760, *cert. denied*, 371 U.S. 922, 83 S.Ct. 289, 9 L.Ed.2d 230 (1962). A scheme to defraud a telephone company of its lawful revenues is within the scope of the statute, *Scott v. United States*, 5 Cir., 1971, 448 F.2d 581, *cert. denied*, 405 U.S. 921, 92 S.Ct. 955, 30 L.Ed.2d 791 (1972).

■ Citing *United States v. Insco*, 5 Cir., 1974, 496 F.2d 204, appellant contends that, even if the sale of "blue boxes" is within the scope of 18 U.S.C., § 1343, he has not received fair notice of the application of the law to his sale of the equipment. Again the evidence is contrary. Mr. Wallace's testimony shows that the primary, if not sole, purpose of the "blue box" enunciated by appellant during their meeting was to defraud the telephone company. *Insco* has no application to this case.

■ Appellant argues that the government's proof of the crime charged failed to prove what he contends to be an essential element, *i. e.*, completion of the phone calls. We need not decide whether completion of the calls is necessary to establish a violation of the statute in question, since there is sufficient proof in the instant case that the calls were completed.

Mr. Wallace testified that each operator answering the overseas calls identified herself as the information operator in the respective foreign city called. There was no defense objection to this hearsay evidence, it being offered to prove that the calls were in fact made to those cities. Without objection at trial, we can only take note of plain error, Rule 52(b), F.R.Cr.P. The fact that the calls went to the cities stated in the indictment was proved by the data recorded by the Hekimian 51–A machine.

■ Appellant's final issue is likewise without merit. He claims that Lander, who cooperated with Wallace in arranging the sales meeting with appellant, was acting in violation of a Texas statute prohibiting unlicensed persons from acting as private investigators.[6] The evidence shows that Lander cooperated with Wallace by informing him about the appellant's desire to sell "blue boxes", and that he drove to San Antonio from Houston with the appellant. The record does not reveal any investigatory actions by Lander. We do not believe that the Texas statute was intended to inhibit private citizens from cooperating with public and private law enforcement officials.

The conviction and sentence appealed from are

Affirmed.

---

**6.** Vernon's Tex.Rev. Civil Statutes, Art. 4413 (29bb).