**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael S. FOSTER,
Defendant-Appellant.**

**No. 77–1063.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 10, 1978.

Decided July 24, 1978.

Ronald L. Rencher, U. S. Atty., Salt Lake City, Utah (Ramon M. Child, former U. S. Atty., Brent Ward, Asst. U. S. Atty., Salt Lake City, Utah, on the brief), for plaintiff-appellee.

Phil L. Hansen, Salt Lake City, Utah, for defendant-appellant.

Before DOYLE and McKAY, Circuit Judges, and STANLEY, Senior District Judge *.

STANLEY, Senior District Judge.

This case arose out of the alleged use by the defendant-appellant of a multi-frequency signal generator (commonly known as a "blue box") for the purpose of circumventing the charges on interstate long-distance telephone calls placed by him. He was convicted of fraud by wire in violation of 18

* Of the District of Kansas, sitting by designation.

U.S.C. § 1343. We have held that section applicable to the unlawful use of an electronic device to defraud a telephone company deprived of revenue by that means. *Brandon v. United States*, 382 F.2d 607 (10th Cir. 1967).

The government's case consisted only of the testimony of a security agent of Mountain Bell Telephone Company and of five exhibits—a Salt Lake City telephone directory, two magnetic tapes, and two paper tapes. (The "blue box" allegedly utilized in the scheme had been suppressed by the court and two other witnesses called by the prosecution were not allowed to testify.) The evidence, if properly admitted, was amply sufficient to support the jury's finding of guilt and the defendant presents for review a single issue: whether the trial court erred by admitting testimony deduced from a scientific electronic device for which no proper foundation was established.

The government witness, Willis Beckstead, had been employed by the telephone company for eighteen years, fifteen years in the engineering department. He had completed a college level electronic technical course and had attended several company schools involving the maintenance of toll-free long-distance traffic. He testified that, although not an electronic engineer or physicist, he was familiar with the operation of the long-distance telephone dialing system and stated that to avoid payment of charges "after the subscriber had dialed the toll-free 800 number, they would apply a 2600-cycle tone to the telephone line which would disconnect the terminating equipment for that particular 800 number. Then they would apply multi-frequency tones which would activate and forward the tones in the toll switching network to the desired number which they wanted to call."

Alerted by the frequency and duration of toll-free calls placed by the defendant, Beckstead began an investigation. He connected a detection device, described as Hekimian equipment, to the telephone line serving the defendant's mother's home and to the defendant's own telephone line, a procedure sanctioned by 18 U.S.C. § 2511(2)(a)(i).

That equipment consisted of a transmitter unit, a receiver unit, and a dial number recorder unit to which was attached a voice tape recorder. Beckstead was familiar with the manner in which the Hekimian equipment works and had tested it. He testified that when a 2600-cycle tone is applied to the line to which it is connected the dial number recorder registers that action by the insertion of a comma on a paper tape. (A 2600-cycle tone is produced whenever a toll-free call is made by using a multi-frequency generator.) The paper tapes produced by the device connected to the monitored lines were introduced in evidence.

The lines were monitored by the Hekimian device for 21 days, the tapes being checked at least twice daily. All calls made over the lines including outgoing calls from Utah to California were recorded. The interstate calls, among others, were accompanied by multi-frequency tones used to dial the called number after gaining access to the toll switching network. They were not placed by the regular direct distance dialing method or by an operator and thus the telephone company's billing procedure was circumvented.

The voice recorder was activated by receipt of a 2600-cycle tone and the magnetic voice tapes produced by the recorder were received in evidence and played to the jury. In three instances the calling party identified himself as "Mike".

No attempt was made to qualify Mr. Beckstead as a person versed in the application of the scientific principles underlying the manufacture or use of the detection equipment. He was not permitted to express an opinion in that field. He testified only as to what he observed and what he knew. He had operated the device, had tested it, knew how it worked, and that it operated as the manufacturer said it should. His testimony was akin to that of a physician who, although not versed in the theories of roentgenology relates his observations and findings from his examination of x-ray photographs.

The Eighth Circuit has found no merit in a contention that a trial court, before ad-

mitting the testimony of a government chemist, should have made a determination that chemical tests used in the identification of drugs were generally acceptable in the scientific community. *United States v. Kirk*, 534 F.2d 1262, 1281 (8th Cir. 1976), *cert. denied*, 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091. In dealing with a challenge to the admission of a tape-recorded conversation it was held in that case that "the contention that foundation should have been provided as to the scientific principle utilized in tape recorders and the reliability and general scientific acceptance of such machines is frivolous."

The defendant made no claim at the trial, nor does he on appeal, that the tapes in evidence were not those produced by the detection equipment. The accuracy of the information recorded by the equipment is not challenged. Mr. Beckstead's testimony established only the authenticity and relevancy of the tapes. The tapes spoke for themselves and required no interpretation by the witness. *Monroe v. United States*, 98 U.S.App.D.C. 228, 234 F.2d 49 (1956), *cert. denied*, 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76; *Brandow v. United States*, 268 F.2d 559 (9th Cir. 1959).

■ The foundation which must be laid for the introduction of tapes produced by electronic equipment—its nature and extent—differs widely. The matter is one largely within the discretion of the trial judge. On the record before us an interference with the exercise of that discretion would clearly be arbitrary. Rule 52(a), Fed. R.Crim.P.

■ Judicial notice may be taken of the nature and manner of use of devices applying fundamental known principles. In this age of rapid technological advance contrivances which a few years ago would have been considered novel in design or application have become commonplace and the accuracy of their product is generally recognized. For example, computer printouts are received in evidence in civil and criminal cases as a matter of course. See *United States v. Fendley*, 522 F.2d 181 (5th Cir. 1975). Wide acceptance of the use of detection devices similar to that here employed is demonstrated by the discussion of their employment in cases involving violation of section 1343. See *e. g., United States v. Harvey*, 394 F.Supp. 228 (E.D.Ark.1974), *aff'd*, 540 F.2d 1345 (8th Cir. 1976); *United States v. Patterson*, 528 F.2d 1037 (5th Cir. 1976), *cert. denied*, 429 U.S. 942, 97 S.Ct. 361, 50 L.Ed.2d 313; *United States v. Sorota*, 515 F.2d 573 (5th Cir. 1975); *United States v. Clegg*, 509 F.2d 605 (5th Cir. 1975); *Brandon v. United States, supra; United States v. Shah*, 371 F.Supp. 1170 (W.D.Pa.1974); *United States v. DeLeeuw*, 368 F.Supp. 426 (E.D.Wis.1974).

The facsimile reproduction of an article appearing in the January 29, 1976 issue of the Wall Street Journal appears in a footnote to the opinion of the Fifth Circuit in *United States v. Patterson, supra.* The article describes the operation of "blue boxes" to circumvent telephone charges and of the Hekimian device for detection of their use. While the trial court did not judicially note reliability and general acceptance of the detection device his admission of the evidence produced by it carries with it the implication that he did not believe it to be subject to reasonable dispute.

■ In the absence of any evidence of unreliability of the detection device or of any claim that its product was inaccurate, we can and do take notice of the reliability and general acceptance of the equipment employed by the telephone company in the investigation of the suspected use by the defendant of an unlawful device to deprive it of revenue. See *Mills v. Denver Tramway Corp.*, 155 F.2d 808 (10th Cir. 1946); *International Bhd. of Teamsters, Etc. v. Zantop Air Transport Corp.*, 394 F.2d 36 (6th Cir. 1968). Our holding that the evidence objected to was properly admitted dictates affirmance of the judgment of conviction and it is AFFIRMED.

McKAY, Circuit Judge, concurring:

I concur in the result in this case because I believe the government met its burden to lay the foundation for the challenged exhibits. They were all the products or partial

products of an electronic device attached to a telephone line and activated by a 2600 cycle signal on the line. The government's testimony that an illegal 2600 cycle signal is the common method of bypassing proper long distance billing equipment was not challenged. The government presented testimony that the daily tests of the monitoring device under known test conditions produced three simple results every time: (1) the test 2600 cycle signal caused a comma to be printed on a tape, (2) the same test signal caused the number dialed to be recorded on a tape, and (3) the same test signal activated a common tape recording device which recorded any conversations transmitted over the tapped line. There was no challenge to the government's testimony that the monitoring device was properly attached to the telephone instruments associated with the defendant. There was substantial corroboration of the end product of this monitoring technique. Under this state of the evidence the government laid an adequate foundation for the admission of the products of the monitoring device. It was not necessary either to qualify an expert on the internal mechanics of the monitoring device or to take judicial notice of its accuracy.