**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 91-1340
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ANDREW J. LONEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

Before WISDOM, JONES, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Andrew Loney participated in a scheme with an employee of American Airlines to add bogus mileage to frequent flyer accounts and to issue award coupons based upon that mileage. He now challenges his conviction of six counts of wire fraud and one count of conspiracy to commit wire fraud. Finding no error, we affirm.

I.

This case involves American Airlines's frequent flyer program, the AAdvantage™ program.[1] Members of the program receive credit for miles traveled on American Airlines, and they may use that credit to obtain awards, including coupons that can be exchanged for free or reduced-fare tickets on American and certain other airlines. Sonja Jefferson was employed as an AAdvantage customer service representative; her duties included making mileage credit entries to AAdvantage members' accounts via her computer terminal. Jefferson devised a scheme to add thousands of unearned miles to the accounts of friends and relatives, enabling them to receive flight coupons based upon the bogus mileage.

Jefferson's and Loney's families had been longtime friends. At the request of Loney, Jefferson located dormant accounts and replaced the names and addresses on those accounts with names and addresses supplied by Loney. She then would add large numbers of miles to these accounts and issue coupons for airline tickets, based upon the bogus mileage, to the names provided by Loney. In a kickback arrangement, Loney sold the coupons to the persons in whose name they had been issued and remitted part of the money to Jefferson. Another American Airlines employee uncovered the scheme when a customer, whose account had been altered, complained.

Loney was charged with twelve counts of wire fraud and aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 2 and 1343,

_____

[1] We view the facts in the light most favorable to the government. United States v. Contreras, 950 F.2d 232, 235 n.1 (5th Cir. 1991).

2

and one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371.[2]  He was convicted on six of the substantive wire fraud counts and on the conspiracy count.  Loney filed a motion for new trial and, at the district court's suggestion, a proffer of evidence.  The court denied the motion without an evidentiary hearing.

## II.

The federal wire fraud statute punishes "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," uses interstate communication "for the purpose of executing such scheme or artifice." Section 1343.[3]  Loney contends that there is insufficient evidence to sustain his conviction on the six substantive wire fraud counts. Although he phrases his argument as a sufficiency-of-the-evidence challenge, the crux of his contention is that he could not be convicted of wire fraud as a matter of law because he did not defraud American Airlines of any "property" as required by the statute.  We review this issue of law de novo.  United States v. Siciliano, 953 F.2d 939, 942 (5th Cir. 1992).

---

[2]  Jefferson previously had pleaded guilty to two counts of wire fraud.

[3]  Since the events at issue in this case, Congress amended the statute to increase the penalties for schemes that "affect[] a financial institution." See 18 U.S.C. § 1343 (West Supp. 1992).  The change is not applicable to this case.

A.

Loney's focus on property stems from <u>McNally v. United States</u>, 483 U.S. 350 (1987). There, the defendants were convicted of mail fraud[4] for their involvement in a scheme in which one defendant, a public official,[5] used his influence to channel state insurance business to an insurance agency that then shared the commissions generated with other insurance agencies, including one in which the defendants had an undisclosed interest. The prosecution's principal theory was that the defendants participated "in a self-dealing patronage scheme [that] defrauded the citizens and government of Kentucky of certain `intangible rights,' such as the right to have the Commonwealth's affairs conducted honestly." <u>Id.</u> at 352.

After surveying the legislative history and purpose behind the fraud statute, the <u>McNally</u> Court concluded that it did not cover deprivations of the right to honest governmental services but instead was "limited in scope to the protection of property rights." <u>Id.</u> at 360.[6] The Court thus reversed the defendants'

_____

[4] Although <u>McNally</u> involved the federal mail fraud statute, 18 U.S.C. § 1341, the Supreme Court has held that the federal mail and wire fraud statutes "share the same language in relevant part" and accordingly are governed by the "same analysis." <u>See</u> <u>Carpenter v. United States</u>, 484 U.S. 19, 25 n.6 (1987).

[5] The Court assumed the defendant was a public official. 483 U.S. at 360.

[6] The Court noted that "[i]f Congress desires to go further" than covering deprivations of property rights, "it must speak more clearly than it has." <u>Id.</u> Congress responded on November 18, 1988, when it amended the federal fraud statutes to define "scheme or artifice to defraud" to "include[] a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Because the conduct in question in this case took place prior to the amendment, we do not apply it. <u>See</u> <u>United States v. Little</u>, 889 F.2d 1367, 1369 (5th Cir. 1989) (implicitly holding that <u>McNally</u>, not § 1343, applies to pre-§ 1343 case), <u>cert. denied</u>, 495 U.S. 933 (1990). <u>See</u> <u>also</u> <u>United States v. Bush</u>, 888 F.2d 1145, 1146 (7th Cir. 1989) ("The new

4

convictions on the ground that the jury "was not required to find that the Commonwealth itself was defrauded of any money or property." Id.

Loney argues that award coupons are not "property" for purposes of the federal wire fraud statute, citing TransWorld Airlines v. American Coupon Exch., 913 F.2d 676 (9th Cir. 1990) (TWA). There, the court concluded that frequent flyer award coupons represent "contract rights" instead of "property rights." Id. at 686-88. TWA is distinguishable, however, in that the court was characterizing award coupons for purposes of the "public policy against restraints on alienation of property." Id. at 685. The case involved a restriction that TWA had placed on the use of award coupons that prohibited the frequent flyer member from assigning awards to anyone other than a relative or legal dependent.[7] The court upheld the restriction as a valid restraint on the assignability of a contract, noting that "the public policy against

_____

§ 1346 could not be applied retroactively, given the Ex Post Facto Clause of the Constitution.").

[7] Specifically, TWA involved several changes in the tariffs governing TWA's frequent flyer program. At the inception of the program, TWA allowed a program member to designate any person of his choice to use an award coupon that he had earned. TWA then amended its tariffs to require that the travel awards be issued in the name of the member, prohibiting their transfer. Finally, TWA changed its tariffs again, this time easing the prohibition by allowing a member to designate a relative to use the award. 913 F.2d at 678.

The American Coupon Exchange (ACE) bought frequent flyer coupons (including those issued by TWA) and sold them to other travelers at a discount. Although TWA allegedly "did not publicly condone or support coupon brokering, TWA accepted it as `a fact of life' and frequently `looked the other way' with its most valued customers by allowing them to sell their certificates or by willingly issuing certificates to spurious `relatives' of these favored patrons." Id. at 679. TWA ultimately decided to sue ACE for fraud and intentional interference with business relations. Id. ACE asserted a number of affirmative defenses, including "that TWA's tariffs are unenforceable because they are unreasonable restrictions upon the transfer of `travel rights' and are therefore contrary to the public policy against restraints on alienation of property." Id.

restraints on the alienation of property is no impediment to the enforcement of TWA's" restriction.  Id. at 686.

The court went on to note, however, that airline tickets could be construed as "property" for other purposes:

> There is, to be sure, language in some cases that tends to support the argument that tickets are `property,' but we believe most of these passing references have occurred in circumstances where `property' was equated with `things of value.'. . . [T]he same principle would seem to underlie those decisions holding tickets to be `property' embraced by theft statutes . . . .

Id. at 688 (emphasis added) (citations omitted).

This "things of value" definition was utilized by the McNally Court, which suggested that the words "to defraud" in the federal fraud statutes "commonly refer `to wronging one in his property rights by dishonest methods or schemes,' and `usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'"  483 U.S. at 358 (citing Hammerschmidt v. United States, 265 U.S. 182, 188 (1924)) (emphasis added).  There is no question that a flight award coupon is "something of value," for it can be used to obtain free flight tickets.[8]  Moreover, we construe "property" in a broad sense for purposes of the federal fraud statutes.  McNally, 483 U.S. at 356.  Consequently, the rule of lenity does not apply.  We therefore reject Loney's argument that award coupons are not "property" under McNally.[9]

---

[8]  If such coupons did not represent something of value, one wonders why Loney went to such trouble to obtain and sell them.

[9]  Loney also contends that the bogus mileage that Jefferson placed in the computer is not property.  This was addressed in United States v. Schreier, 908 F.2d 645 (10th Cir. 1990), cert. denied, 111 S. Ct. 787 (1991), in which one of the defendants had access to American Airlines's computer reservation system.  The defendant used the system to replace the names of

But even if we assume <u>arguendo</u> that award coupons are not property, Loney's conviction still stands. His scheme was designed to defraud American of its lawful revenues, which is actionable under the statute. <u>See</u> <u>United States v. Patterson</u>, 528 F.2d 1037, 1041 (5th Cir.) (citing <u>Scott v. United States</u>, 448 F.2d 581 (5th Cir. 1971), <u>cert. denied</u>, 405 U.S. 921 (1972)), <u>cert. denied</u>, 429 U.S. 942 (1976).[10]  Indeed, the statute criminalizes deprivations of "money or property," not just property.[11]

The scheme in this case is quite similar to that involved in <u>Patterson</u>.  There, the defendant devised a plan to defraud the telephone companies of their lawful revenues by marketing "blue

---

passengers who had taken particular flights with names of fictitious persons whom the defendant had enrolled in the AAdvantage program.  The actual passengers had not requested that the mileage be credited to their AAdvantage accounts.

The court held that the scheme "involved the accumulation of mileage for which American would not otherwise be liable because it was not claimed by the passengers who actually flew." <u>Id.</u> at 647.  As such, "the creation of a liability on the part of a corporation is no less the misappropriation of property than would be the theft of an asset worth an equal amount." <u>Id.</u> Loney argues that <u>Schreier</u> was wrongly decided.  Since we find that award coupons are property, we do not need to reach the bogus mileage question.

[10]  This pre-<u>McNally</u> holding is still viable.  As we noted in <u>United States v. Herron</u>, 825 F.2d 50, 51 (5th Cir. 1987), there were two distinct types of pre-<u>McNally</u> fraud cases.  One category "included schemes which intend the deprivation of tangible economic interests, i.e., money or property." <u>Id.</u> (citations omitted).  The second category "concerned schemes to deprive an individual or entity of intangible rights or interests, otherwise known as 'fiduciary fraud' or `intangible rights' fraud." <u>Id.</u> (citations omitted).  We noted in <u>Herron</u> that after <u>McNally</u>, "the `intangible rights' line of cases are of dubious precedential value unless there was a direct deprivation of money or property." <u>Id.</u> at 54-55.  We then listed a number of cases, including <u>Patterson</u>, "only to emphasize that their language must now be understood as limited by <u>McNally</u>." <u>Id.</u> at 55 n.6.  We do not see how <u>Patterson</u>'s holding that the statute reaches schemes to deprive victims of their lawful revenues is affected by the <u>McNally</u> holding, as deprivations of "money" are plainly within the purview of the statute.

[11]  Some courts have treated "money" as a form of property. <u>See</u>, <u>e.g.</u>, <u>United States v. Wellman</u>, 830 F.2d 1453, 1463 (7th Cir. 1987) (in scheme in which defendant sold tanks as meeting federal standards but which in fact did not, deprivation of "property" could be the money that the victim spent on purchasing the tanks).

boxes," which enable a person to bypass the regular electronic circuitry used for recording calls. The "blue boxes" allow persons to make calls without being charged for them. The defendant in Patterson was caught when he attempted to sell one of the devices to a phone company employee who was posing as a booking agent for a musical group.

The Patterson defendant devised a way to get something SQ phone calls SQ for nothing. Similarly, Loney devised a way to get award coupons based upon bogus mileage. And like the Patterson defendant, Loney wanted to make money on the scheme. Thus, he sold the coupons to others, remitting some of the money to Jefferson and keeping some for himself. That money should have gone to American Airlines.[12]

Loney appears to anticipate these arguments, for he maintains that the government failed to show that American Airlines actually suffered financial loss.[13] But such a showing is not necessary.

---

[12] Moreover, the AAdvantage program increases American Airlines's revenues because oftentimes AAdvantage members continue to select that airline as their preferred carrier but do not actually claim awards. As Jayne Metz, a systems administrator for American, testified,

Q:    How is [the AAdvantage program] successful if it doesn't make you any money?

A:    Not everyone claims an award. I mean we have a lot of members that fly and don't actually claim awards, redeem their miles, so we are still getting revenue for the passengers that fly.

Jefferson manipulated accounts that had remained dormant for a substantial period of time SQ accounts of customers who had not used their mileage. Presumably, these miles would not have been redeemed but for the scheme. Thus, the scheme created an obligation for American SQ the obligation to issue free tickets to passengers based upon award coupons SQ that otherwise would not have existed. See Schreier, 908 F.2d at 647.

[13] Specifically, Loney contends that (1) the government presented evidence at trial showing that there were tickets issued and used for only two of the six substantive wire fraud counts; (2) there was no showing that the persons who flew on the tickets issued on the certificates would have purchased fare tickets from American for the travel indicated; and (3) the

8

A wire fraud offense requires proof of (1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme. United States v. St. Gelais, 952 F.2d 90, 95 (5th Cir. 1992); United States v. Shively, 927 F.2d 804, 813 (5th Cir.), cert. denied, 111 S. Ct. 2806 (1991). In addition, the government must prove a specific intent to defraud, which requires a showing that the defendant intended for some harm to result from his deceit. St. Gelais, 952 F.2d at 95. The government does not need to prove that the harm actually came about, however.

As the Second Circuit has noted, "[i]t need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim." United States v. Schwartz, 924 F.2d 410, 420 (2d Cir. 1991). See also Patterson, 528 F.2d at 1041 ("[t]here is no necessity for the government to prove actual financial loss").[14] Indeed, the plain language of the

---

government did not prove "that the persons who flew with these tickets displaced other, potential fare-paying passengers, . . . [or] that the airline incurred any additional costs in flying these passengers."

[14] Again, we do not see how McNally, as discussed in Herron, in any way limits Patterson's holding that the government need not show actual harm. In fact, the McNally Court expressly addressed the statute's disjunctive terminology, which "criminalize[s] schemes or artifices 'to defraud' or 'for obtaining money or property by means of false or fraudulent pretenses . . . .'" 483 U.S. at 358 (emphasis added). The Court concluded that Congress added the "for obtaining money or property" phrase "simply [to] ma[k]e it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property." Id. at 359 (emphasis added). Thus, we assume from this that Congress meant the statute to criminalize the use of wire communications to further schemes that would culminate at some time in the future. See also United States v. Johnson, 700 F.2d 163, 177 (5th Cir.), aff'd in part and rev'd in part on other grounds, 718 F.2d 1317 (5th Cir. 1983) ("The scheme to defraud need not be successful to create a violation of the wire fraud statute."); United States v. Dynalectric Co., 859 F.2d 1559, 1556 (11th Cir. 1988) ("success of the scheme [is] irrelevant" (citing cases)), cert. denied, 490 U.S. 1006 (1989); Donna M. Maus, Comment, License Procurement and the Federal Mail Fraud Statute, 58 U. Chi. L. Rev. 1125, 1140 n.90 (1991) ("The fraud may remain inchoate" (citing cases)).

statute does not criminalize causing actual harm to the victim; rather, it proscribes the use of a wire communication in furtherance of a "scheme or artifice to defraud" that one has devised.[15]

## C.

Since we have resolved in the affirmative the question of whether Loney's scheme, if proven, fell within the purview of the statute, the only remaining issue is whether the government met its burden of proof. Viewing the evidence in the light most favorable to the government, see United States v. Contreras, 950 F.2d 232, 235 n.1 (5th Cir. 1991), we find that there is ample evidence, including Jefferson's testimony, that Loney schemed to defraud American Airlines of its lawful revenues and property and used the

---

[15] Loney cites United States v. Evans, 844 F.2d 36, 39 (2d Cir. 1988) (emphasis added), which states that

> as we read McNally, the Supreme Court did not focus on whether the person deceived also had to lose money or property. Nonetheless, this may be the correct view of the statute. If a scheme to defraud must involve the deceptive obtaining of property, the conclusion seems logical that the deceived party must lose some money or property.

The Evans court went on to note that "the case before us today does not require us to decide this general question." Id. at 40.

As an initial matter, we note that the Evans court's remarks as to actual loss were, by the court's own admission, dicta. We also observe that although the Schwartz panel discussed Evans extensively, see Schwartz, 924 F.2d at 417, it did not point out any inconsistency between the Evans dicta and its statement that "[i]t need not be shown that the intended victim of the fraud was actually harmed." Id. at 420. We therefore agree with the Eleventh Circuit that Evans and other decisions "whose language might be interpreted to require proof of actual loss" do not

> address the distinction between a successful and an unsuccessful scheme to defraud the victim of money or property. These cases do not address the issue of whether a mail fraud conviction can stand where there is sufficient evidence that the defendants schemed and intended to defraud the victims of money or property, but failed to cause the victims any financial loss. Thus none of these cases [is] apposite.

Dynalectric, 859 F.2d at 1577 n.22.

10

wires to further that scheme.[16]  We therefore conclude that there is sufficient evidence to sustain Loney's conviction on the substantive wire fraud counts.

### III.

Loney also challenges his conspiracy conviction.  Although he phrases his argument in terms of a challenge to the sufficiency of the evidence, the essence of his argument is that he could not have been convicted for conspiracy because the United States was not the "target" of the conspiracy.  Again, we apply a de novo standard of review.

Loney's conviction for conspiracy to commit wire fraud rests on 18 U.S.C. § 371, which criminalizes a conspiracy "to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose . . . . " Thus, section 371 punishes two distinct types of conspiracies: those "to commit any offense against the United States" and those "to defraud the United States."  United States v. Haga, 821 F.2d 1036, 1039 (5th Cir. 1987) ("Cases construing section 371 have made it plain that the `commit any offense' clause and the `defraud the United States' clause describe different criminal offenses . . . .").  Loney was indicted and convicted of an "offense"-type conspiracy.

---

[16]  Loney does not challenge the sufficiency of the government's proof as to the remaining elements of wire fraud (intent and the use of wire communications).  We therefore do not address the sufficiency of the evidence as to these elements.

Loney bases his argument upon Tanner v. United States, 483 U.S. 107 (1987), in which the defendants conspired to defraud a private corporation that had received federal financial assistance and thus was subject to federal supervision. The defendants argued that their convictions under the "defraud" prong of section 371 should be reversed because the corporation was a private entity, despite its receipt of federal assistance.

The Court agreed, holding that the United States and its agencies must be the target of a conspiracy "to defraud the United States." As the Court noted, "[t]he conspiracies criminalized by § 371 are defined not only by the nature of the injury intended by the conspiracy, and the method used to effectuate the conspiracy, but also SQ and most importantly SQ by the target of the conspiracy." Id. at 130.

Loney argues that the United States must be the target of a conspiracy under the "offense" prong as well. He urges that in order to conspire to commit "any offense against the United States," the United States must be the victim (or target) of that conspiracy. The government, on the other hand, argues that the phrase should be read to reach conspiracies to commit any offense against the laws of the United States S)Q in other words, conspiracies to commit a federal offense. This question has divided the circuits. See United States v. Gibson, 881 F.2d 318 (6th Cir. 1989) (United States need not be the target of an offense-prong prosecution); United States v. Hope, 861 F.2d 1574 (11th Cir. 1988) (contra: "The holding in Tanner . . . applies

with equal force to the `any offense' clause of § 371 as it does to the `defraud' clause." ).

The Eleventh Circuit, however, may soon change its mind. In United States v. Falcone, 934 F.2d 1528, 1538 (11th Cir. 1991), vacated and en banc rehearing granted, 939 F.2d 1455 (11th Cir. 1991), the court applied Hope to the facts before it but questioned its reasoning. In a special concurrence written by Chief Judge Tjoflat[17] and joined by Judge Kravitch and retired Justice Powell, the court thoroughly examined the history behind section 371 and concluded that the statute should not be read to require that the United States be a target of an "offense" prong conspiracy.

As the Chief Judge noted, the statutory precursor to section 371 punished conspiracies "to commit any offense against the laws of the United States." Id. at 1548 (Tjoflat, J., specially concurring) (emphasis added by court). Congress revised and codified the statute in 1873, omitting the "the laws of" language. However, "[t]his omission was not . . . intended to change the substantive meaning of the statute," as the revisors had no authority to make substantive changes in the law. Id. Thus, when courts faced the new language in the late nineteenth and early twentieth centuries, they interpreted the change as nonsubstantive. Id. at 1548-49 (listing cases). In fact, in 1921 the Supreme Court stated that section 371's precursor covered conspiracies to violate

---

[17] Chief Judge Tjoflat was also on the Hope panel. Falcone, 934 F.2d at 1548 (Tjoflat, J., specially concurring).

13

all federal statutes.  Id. at 1549 (discussing United States v. Hutto, 256 U.S. 524, 539 (1921)).

Chief Judge Tjoflat also noted that he did not think "that the Tanner Court intended to remove from the offense clause of section 371 the wide range of conspiracies to violate laws of the United States . . . ." Id. He went on to list numerous cases S)Q both before and after Tanner S)Q in which the government successfully prosecuted defendants under the "offense" clause where the United States was not the object of the conspiracy.  Id. at 1549-50 (citing cases).

Finally, as Chief Judge Tjoflat pointed out, the "offense against the United States" language can be found in numerous provisions of the United States Code.  Id. at 1550-51.  It is interesting to note that 18 U.S.C. § 2, under which Loney was convicted for aiding and abetting, contains such language.[18]  Loney does not contend, however, that one cannot "aid and abet" wire fraud because the target of the wire fraud in this instance was not the United States.

In light of the Eleventh Circuit's rehearing of Falcone and the persuasiveness of the Sixth Circuit's rationale, we join the

_____

[18]  Section 2 reads as follows:

    (a)   Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

    (b)   Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.  In United States v. Lennon, 751 F.2d 737, 741 (5th Cir.), cert. denied, 471 U.S. 1100 (1985), we noted that § 2(b) "applies generally to all federal criminal statutes . . . ."

14

latter in holding that the United States need not be the target of section 371 "offense" prong conspiracy.  While this court has not directly addressed the issue, it SQ like the Eleventh Circuit SQ has affirmed numerous convictions (both before and after Tanner) under the "offense" clause where the United States has not been the object of the conspiracy.[19]  We decline to read Tanner in such a way as to cast doubt on these decisions.  Given the history behind section 371, we believe that the better reading of the statute is that the "offense" clause criminalizes those conspiracies that contemplate the commission of an offense that is made illegal by federal law.  Given that there is ample evidence that Loney conspired to commit wire fraud, we uphold his conviction of conspiracy.

IV.

Loney next contends the district court erred in admitting the government's Exhibit #21.  We review a district court's admission of evidence for abuse of discretion.  United States v. Moye, 951 F.2d 59, 61 (5th Cir. 1992).

---

[19]  See, e.g., United States v. Shively, 927 U.S. 804, 807 (5th Cir.) (conspiracy to commit arson in violation of 18 U.S.C. § 844(i), cert. denied, 111 S. Ct. 2806 (1991); United States v. Hatch, 926 F.2d 387, 393 (5th Cir.) (conspiracy to commit mail fraud in violation of 18 U.S.C. § 1341 as part of a scheme to defraud local sheriff's office of its general fund monies), cert. denied, 111 S. Ct. 2239 (1991); United States v. Schmick, 904 F.2d 936, 340 (5th Cir. 1990) (conspiracy to violate firearms statute, 26 U.S.C. § 5861), cert. denied, 111 S. Ct. 782 (1991); United States v. Yamin, 868 F.2d 130, 133 (5th Cir.) (conspiracy to traffic in counterfeit goods in violation of 18 U.S.C. § 2320), cert. denied, 492 U.S. 924 (1989); United States v. Gordon, 780 F.2d 1165, 1169 (5th Cir. 1986) (conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 as part of a scheme to defraud insurance company); United States v. Franklin, 586 F.2d 560, 564 (5th Cir. 1978) (conspiracy to transport stolen goods in interstate commerce in violation of 18 U.S.C. § 2314), cert. denied, 440 U.S. 972 (1979).

15

American Airlines keeps detailed records of its AAdvantage accounts on a computer database. When the account manipulation came to its attention, it conducted a computer search of its records, asking that the computer find accounts in which there had been a name change, the addition of 50,000 or more bonus miles, and the issuance of certificates soon after the addition of the bonus.[20] The result of the search is what became Exhibit #21 SQ a thirty-five-page compilation of computer records that provides information on approximately seventy accounts, including, among other things, the name under which the account was originally opened, the number of bonus miles added to the account, the name to which the account was changed, and the number of the award coupon, the date on which a ticket was issued in exchange for the coupon, and the value of the ticket. At trial, the government connected Loney to several of the manipulated accounts listed in the exhibit.

A.

Loney contends that Exhibit #21 was inadmissible hearsay because it does not fall under the business records exception of Fed. R. Evid. 803(6), which permits the admission of "[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by . . . a person with knowledge, if kept in the course of a regularly conducted business activity . . . ." Loney argues that Exhibit #21 was not "kept in the course of a regularly conducted

---

[20] The listing appears to go back to May 1986.

16

business activity" because it was made "in anticipation of litigation."

Loney, however, misconstrues the "regularly conducted business activity" requirement. Rule 803(6) does not require that the _summary_ of the data be kept in the regular course of business. Rather, it is the underlying data that must be so kept. And Loney does not challenge the government's foundation for admitting the underlying data.[21] Once the underlying data is admissible under the business records exception, a summary of that data can be admitted under Fed. R. Evid. 1006, which permits the parties to present a "chart, summary, or calculation" where "[t]he contents of voluminous writings . . . cannot conveniently be examined in court." Thus, the district court properly admitted Exhibit #21 under rules 803(6) and 1006.

## B.

Loney's real complaint appears to be that Exhibit #21 contained evidence "of numerous transactions, between Jefferson and persons other than Loney, with which transactions Loney had absolutely nothing to do." He argues that evidence of these

---

[21] In fact, in his motion for new trial Loney concedes that at least some of the underlying data would fall under the business records exception. Specifically, Loney stated that "Government Exhibit #21 invaded the province of the jury, by impermissibly summarizing the back-up documents which _were_ properly admitted as business documents and from which the jury should have drawn its conclusions." The back-up documents to which Loney refers apparently are the tickets and coupons the government produced in conjunction with Exhibit #21. Jayne Metz was asked by the prosecutor, "Are you able to recognize those documents, ma'am?" She replied "Yes, sir." The prosecutor then asked, "Are those some of the tickets and supporting information that were used or that were also records of American Airlines that are also reflected in Government Exhibit #21?" She responded in the affirmative.

17

transactions was irrelevant and unduly prejudicial. It does not appear, however, that Loney objected to the exhibit on relevance grounds SQ as opposed to hearsay grounds SQ during trial.[22] We therefore are obligated to use a plain error standard of review. Fed. R. Crim. P. 52(b).

In order to justify a departure from the contemporaneous objection rule, an error must be of a nature that it would result in a miscarriage of justice if not remedied. Contreras, 950 F.2d at 239. Loney cannot make this showing. As discussed more fully below, the jury carefully scrutinized the evidence and convicted Loney of only those transactions with which he was associated. We therefore decline to reverse Loney's conviction on this ground.[23]

-------

[22] Loney's attorney made the following objection after the government sought to admit Exhibit #21:

> Your Honor, we object on the grounds that this is hearsay evidence. It's not a business record prepared in the normal course of business but was prepared in anticipation of litigation. It's not the normal course of business to prepare this sort of compilation and therefore we object on the grounds of hearsay and it's also hearsay within hearsay in that the information contained therein is also hearsay.

It appears that Loney did not raise the relevance/prejudice issue until his motion for new trial, in which he noted that "Government Exhibit #21 was extremely prejudicial to defendant LONEY in that it contained accounts of numerous transactions with which defendant LONEY was not charged and in which there was no suggestion or evidence that LONEY had participated."

[23] Loney also complains that "there was no foundation laid that all of the documents underlying Government Exhibit #21 had been introduced into evidence or even made available to the defendant." It is true that rule 1006 requires that "[t]he originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court." There is no indication, however, that Loney ever made this objection to the district court. Again, we see no way in which Loney possibly could show that a miscarriage of justice would result from his inability to examine all the underlying data, assuming that such data was not made available to him.

18

V.

Loney's fourth ground for error is that there was a fatal variance between the allegations of conspiracy in the indictment and the proof adduced at trial. Loney bases his argument on the fact that the conspiracy count alleges that

> [i]t was a part of the conspiracy that ANDREW J. LONEY, defendant, and Sonja Maria Jefferson would and did fraudulently cause the issuance of American and Pan Am tickets of a value of approximately $269,077.42, in return for the fraudulently issued AAdvantage mileage credits.

Loney argues that the dollar figure in the indictment reflects the sum of the fraudulent transactions in which Jefferson was involved (the sum of the fraudulent transactions in Exhibit #21), including those that did not involve him. He concludes from this that, instead of the "grand conspiracy" alleged in the indictment, the government proved (at most) only a number of smaller conspiracies, one of which involved Loney.

First, we take issue with Loney's characterization of the government's theory in the indictment as a "grand conspiracy." Although the government apparently did use Exhibit #21 for arriving at an estimate of the value of the award coupons,[24] the rest of the indictment does not attempt to connect Loney with the approximately seventy transactions listed in Exhibit #21, let alone even mention them. In addition to the portion quoted above, the conspiracy count charges as follows:

---

[24] Jayne Metz referred to the estimated total once during her testimony, and the prosecutor referred to the estimated total twice during his closing argument.

19

It was a part of the conspiracy that ANDREW J. LONEY, defendant, would supply Sonja Maria Jefferson with the names of persons not authorized to use the AAdvantage accounts.

It was a part of the conspiracy that Sonja Maria Jefferson would and did enter name and address changes on the computer, changing the names and addresses on the AAdvantage account information listed in American's computer, <u>for approximately twenty (20) AAdvantage accounts</u>, removing the name and address of an actual member and fraudulently substituting a name and address supplied by ANDREW J. LONEY, of a person not authorized to use that account. [Emphasis added.]

Thus, although Jefferson may have been in dozens of transactions, the indictment charged Loney with committing wire fraud on only twelve occasions and with conspiring with Jefferson with regard to approximately twenty accounts. Moreover, the government did not attempt to tie Loney to all the transactions listed in Exhibit #21 at trial. Instead, the government called the jury's attention to only fourteen transactions, twelve of which were alleged in the substantive wire fraud counts.

Even if we assume that there was a variance, however, "the variance would not be reversible error unless it prejudiced [the defendant's] substantial rights." <u>United States v. Richerson</u>, 833 F.2d 1147, 1155 (5th Cir. 1987). This Loney has not shown.

Loney argues it is likely that he was prejudiced by the variance because the jury could have mistakenly attributed all the transactions listed in Exhibit #21 to him. The jury, however, was not so confused. It convicted Loney of six counts of wire fraud and acquitted him of six counts. The six counts on which he was acquitted involved transactions between Jefferson and Loney's father, Aston. Aston and Jefferson testified that Loney had

20

nothing to do with these transactions, and the jury obviously believed that testimony (as Loney himself observes in his brief). Thus, the jury carefully weighed the evidence presented at trial and convicted Loney only on those transactions in which he was involved.[25]

Finally, and most importantly, we held in Richerson that there can be no substantial prejudice where "the Government proves multiple conspiracies and a defendant's involvement in at least one of them . . . ." Id. (quoting United States v. L'Hoste, 609 F.2d 796, 801 (5th Cir.), cert. denied, 449 U.S. 833 (1980)). That is the case here. Regardless of how many conspiracies were alleged and proved, there was sufficient evidence to convict Loney of participating in the conspiracy with Jefferson that was alleged in the indictment. Loney therefore cannot show that he suffered substantial prejudice.[26]

---

[25] In addition, as we noted in Richerson, transference of guilt is unlikely as a general matter where the defendant is tried alone, as was Loney. 833 F.2d at 1155.

[26] Loney cites two additional arguments. Both are without merit.

First, he complains that the district court did not instruct the jury on multiple conspiracies and that although he did not object, the lack of instruction constitutes plain error. The record reveals, however, that the district court did in fact give the pattern jury instruction on multiple conspiracies.

Loney also argues that the variance prejudices him by leaving him vulnerable to reprosecution, alleging that "it is unclear exactly for what conduct [he] has been found guilty . . . ." This argument is untenable. At most, Loney argues that there is a variance between the number of conspiracies alleged in the indictment (one) and the number of conspiracies proved at trial (several). The conduct alleged in the indictment and the conduct adduced at trial (i.e., a conspiracy between Jefferson and Loney encompassing "approximately twenty" fraudulent transactions) were identical. Therefore, the alleged variance stemming from the estimated dollar amount in no way creates a doubt as to "what conduct" he was convicted for.

21

VI.

In his last assignment of error, Loney contends the district court erred in refusing to grant his motion for a new trial, in which he argued that his trial was fundamentally unfair because the prosecutor called him a "liar" in his closing argument.[27]  Loney testified that he stopped the "transactions" with Jefferson in June 1987, when Jefferson called him and told him that the coupons "were no longer good."  He testified that at that time he "thought . . . that instead of turning all the money over to American Airlines she was possibly keeping some of the money . . .."  Exhibits showed, however, that Loney paid Jefferson thousands of dollars after that time.  In his closing argument, the prosecutor drew the jury's attention to this discrepancy and told the jury that "[h]e's not being truthful with you."

Loney made no objection to the prosecutor's statements; nor did he ask to reopen the evidence in an attempt to explain the inconsistency.  Rather, in his motion for new trial he submitted an affidavit stating that he continued remitting funds to Jefferson after June 1987 because "he believed certain funds were still due to American Airlines, and had nothing to do with Jefferson."

There is no indication that the affidavit alleged that there was "newly discovered" evidence relevant to Loney's trial.[28]

---

[27]  Loney also based his request for a new trial upon the admission of Exhibit #21.

[28]   In order to show that a new trial is necessary based upon newly discovered evidence, a defendant must show, among other things, that the evidence was "discovered following trial" and that he exercised "due diligence" in attempting to discover it.  Boyd v. Puckett, 905 F.2d 895, 896 n.1 (5th Cir.), cert. denied, 111 S. Ct. 526 (1990).

22

Rather, he was in possession of the "evidence" (the explanation of the inconsistency) all along but apparently did not realize its relevancy. In these circumstances, where there is no newly discovered evidence, the denial of a motion for a new trial is not appealable per se; rather, the appeal is taken from the final judgment, and the appellate court examines the ground for error. Youmans v. Simon, 791 F.2d 341, 349 (5th Cir. 1986). Given Loney's failure to object to the prosecutor's remarks at trial, we review for plain error.

This court recently noted in United States v. Webb, 950 F.2d 226, 230 (5th Cir. 1991), that it is well established that a prosecutor may recite to the jury those inferences and conclusions he wishes them to draw from the evidence so long as those inferences are grounded upon the evidence. The prosecutor in this case drew the jury's attention to the fact that Loney had said one thing but his actions showed another. Far from causing a miscarriage of justice, the comments of the prosecutor were entirely appropriate, given the evidence before the jury. We therefore conclude that this ground for error is without merit.

VII.

In sum, we find that Loney's arguments regarding Exhibit #21, variance, and the prosecutor's remarks are without merit. We also conclude that Loney used interstate wires to further his scheme to defraud American Airlines of its money and property and therefore AFFIRM his substantive wire fraud convictions. Finally, we AFFIRM

23

his conviction for conspiracy, concluding that the United States does not need to be the target of an "offense"-clause conspiracy under section 371.