REVISED MAY 3, 2013

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

May 2, 2013

Lyle W. Cayce
Clerk

No. 11-30525

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

JERMAINE SURTAIN; CHARLES MOSS; DAVID SAMUELS,

Defendants-Appellants

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:09-CR-123-4

On Petition for Panel Rehearing

Before KING, SOUTHWICK, and GRAVES, Circuit Judges.

PER CURIAM:[*]

The original opinion in this case was issued on March 26, 2013. The defendants' petitions for panel rehearing are GRANTED to the extent that we withdraw our previous opinion and replace it with the following. In all other respects, the petitions are DENIED.

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

Defendants-Appellants appeal their convictions and sentences on various counts relating to their involvement in three insurance fraud schemes. For the reasons that follow, we VACATE David Samuels's sentences on Counts 12 and 13 of the superseding indictment, REMAND for resentencing on one of those counts (at the government's election), VACATE Samuels's conviction on Count 4, and AFFIRM in all other respects.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 4, 2009, the grand jury returned a superseding indictment against Defendants-Appellants David Samuels, Charles Moss, and Jermaine Surtain, variously charging them and three other co-defendants with one count of conspiracy to commit mail and wire fraud under 18 U.S.C. § 371, three counts of mail fraud under 18 U.S.C. § 1341, seven counts of wire fraud under 18 U.S.C. § 1343, one count of use of fire to commit obstruction of justice and two counts of use of fire to commit mail fraud under 18 U.S.C. § 844(h)(1), one count of making a false statement under 18 U.S.C. § 1001, and aiding and abetting under 18 U.S.C. § 2 as to the wire fraud, mail fraud, and use-of-fire counts. The charges arose from separate insurance fraud schemes that culminated in arson, murder, and the destruction of a van used in the killing.

At trial, cooperating co-defendant Damian Landry testified that Samuels worked with him at Volunteers of America, an elder care provider in New Orleans. When Landry and his wife fell behind on mortgage payments for her house in 2002, Samuels advised Landry to increase his insurance coverage on the house and burn it down for the proceeds. Landry agreed, and Samuels set out to find someone who would set fire to the house for a share of the insurance money. Samuels ultimately recruited Moss, an army buddy of his from Detroit.

Landry testified that on the day the house burned down, he and Samuels reported to work, and Landry then left to get breakfast. Samuels and Moss met Landry later that morning and told him they would burn the house that day.

Samuels gave Landry the keys to his green Chrysler van, and Landry gave Samuels the keys to a white 1991 Chevrolet with temporary tags. The car was unregistered, making it impossible to trace. At Samuels's direction, Landry went to a client's house so that he would have an alibi.

A neighbor testified that he was at home when he heard an explosion from across the street. When he got to the window, he saw Landry's house burning. He also saw a man with a burned face and hair leave the house and enter an older white car with temporary tags, which then sped away. Landry received a phone call from his probation officer, who told him that his house was on fire. Before Landry could return home, Samuels called and told him to come to Samuels's house. When he arrived, Samuels and Moss entered Landry's vehicle. Moss's face was burned, and Samuels said they had to take Moss to the hospital. Landry refused, and Samuels instead had his brother Chris take Moss. Landry then returned home to find his house destroyed. He and Samuels later took the white Chevrolet to a wrecking yard to be demolished.

Landry filed a fire insurance claim on the house, but did not mention the arson to the insurance company. Because the insurance payment he received was not as large as he had anticipated, he used it to pay the mortgage company and did not tell Samuels that he had obtained the money. After Samuels pressured him for the insurance proceeds several times (sometimes violently), Landry gave Samuels $3,000 from his tax refund.

Landry further testified that while the fire insurance claim was pending in July 2003, he accompanied Samuels to insurance agent Stefan James's office. Samuels and James (a cooperating co-defendant in this matter) discussed obtaining $100,000 to $150,000 of insurance coverage on the life of Treyor Winston August, Samuels's cousin. To that end, Samuels unsuccessfully sought to convince Landry to pose as August.

James testified that he knew Samuels through his wife, who also worked at Volunteers of America. James had sold life insurance policies to Samuels and Samuels's wife, and had socialized with Samuels on occasion. James described Samuels as a braggart, and testified that Samuels once said he would have his cousin killed for stealing drugs from him. Several weeks after making this statement, Samuels came to James's office with Landry.

Even though James was aware of Samuels's fraudulent and murderous intentions, he ultimately sold Samuels a "double-indemnity" life insurance policy. This meant that although the policy's face value was $75,000, it would pay out $150,000 if August's death were accidental. Samuels structured the policy in this way because any policy with a face value of $100,000 or more would have prompted the underwriter to collect the insured's blood and urine, and administer a medical exam. August surely would have become aware of the policy had he been asked for these things. The policy's beneficiaries—Samuels and his mother, Teresa—were falsely listed as August's brother and mother. Although August was listed as the policy's owner, Samuels signed August's name on the application, had his own address listed on the policy to prevent August from discovering its existence, and also noted on the application that August should not be contacted at his workplace regarding the policy. Samuels was involved in three subsequent fraudulent policies: (1) He took out a second policy on August's life for $25,000, the beneficiary being his sister, co-defendant Maria Samuels; (2) he provided information to allow James to obtain a $25,000 policy on August's life; and (3) he obtained a $90,000 "key man" policy on August's life, the beneficiary being his company, Sam's Realty and Maintenance.

Samuels's brother Chris, who had taken Moss to the hospital following the Landry house fire, testified that Samuels asked him to kill August for $20,000. Samuels showed him one of the fraudulent life insurance policies to demonstrate a means of payment. Chris testified that he was unwilling to kill his cousin, but,

wanting to stall Samuels and warn August, said he would do it. Chris told August of Samuels's plan and the insurance policy, and gave him a gun for protection. As he related at trial, however, he felt that August did not take the threat seriously.

Apparently becoming impatient that Chris had not killed August, Samuels eventually sought someone else for the task. According to phone records, Samuels placed two calls on April 24, 2004 to Surtain, who was his sister's ex-boyfriend and the father of her child, and who had recently returned to New Orleans. Kelvin Marshall, who three years later would be apprehended with Surtain in a burglary, testified that between 9:00 and 10:00 PM on April 24th, Surtain called him to obtain nine-millimeter rounds for a pistol. Marshall went to a friend's house on Cortez Street to retrieve the ammunition. He then gave it to Surtain, who was waiting outside with his girlfriend. The girlfriend dropped Marshall off at a nearby bar; Surtain test-fired the pistol out the vehicle's window along the way. The girlfriend dropped Surtain off on Canal Street near Warren Easton High School.

August's girlfriend testified that Samuels came to her house on April 24th to ask for August. Although August was not home the first time Samuels came by, Samuels returned a second time after he had come back from work. Samuels stayed for a while, then left. Around nightfall, Moss came to August's home in Samuels's green van. Moss spoke with August, left, then returned between 8:00 and 8:30 PM. He and August left between 9:00 and 9:30 PM, purportedly to celebrate August's birthday. Samuels attended a church service that night.

Samuels later told a special agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that August had been shot in "the van," ran away, struggled with the shooter, and was shot once more. A trail of blood consistent with this version of events was found at the murder scene. An eyewitness testified that he and his wife were driving south on Bienville Street

between 9:50 and 10:00 PM on April 24th. Shortly after they crossed Jefferson Davis Parkway, the witness saw a man bending over another man on the median, and noticed the man on the ground had a large amount of blood on his shirt. As the witness drove away, the first man shot the other one in the head. An autopsy revealed that August had been shot six times, including once in the head. Police recovered spent nine-millimeter casings from the murder scene.

Surtain's girlfriend testified that Surtain called her later that night to pick him up because police were in the area. She picked him up about two blocks away from Jefferson Davis Parkway, and dropped him off on Cortez Street. Marshall testified that Surtain returned to the house on Cortez Street that night. Surtain's jeans were covered in blood. The next day, Surtain told Marshall and others that "he shot a dude" who then wrestled Surtain to the ground, causing him to drop the gun. Surtain said that he "slammed the dude," retrieved the gun, and shot him again. James testified that Samuels told him he had cleaned out blood from the van with bleach or ammonia.

At 10:53 PM on April 24th, Samuels called James, and said, "Winston ha[s] been killed. He's dead. What do we need to do to get the claims process going?" To avoid suspicion, James advised Samuels to wait before filing a claim. Samuels's sister's claim was filed in June 2004, and his mother's claim was filed in July 2004. The insurance companies denied the claims due to misrepresentations on the applications, and mailed refunds of the premiums to Samuels, his sister, and his mother.

A New Orleans police investigator spoke with Moss and Samuels on the morning of April 26th, and explicitly told Moss not to leave town until the detective investigating August's murder could interview him. Samuels's girlfriend took Moss to the bus station later that day, where he boarded a bus for Detroit. Although Moss initially told police that August was alive and walking

up the street the last time Moss had seen him, he later told ATF agents that he saw August lying in the fetal position after Moss exited a bar.

A GEICO employee testified that on April 28, 2004, someone requested increased coverage on Samuels's van. Samuels's ex-wife and then-girlfriend, Yolanda Fleming, testified that Moss called her and Samuels's home on the night of May 7, 2004, asking for Samuels. Samuels, who had just returned home, spoke with Moss for about five minutes, then left the house. Samuels testified that he had also spoken with Surtain that night, but said their conversation had been about drugs. Phone records showed that Samuels and Surtain called each other twenty-six times on May 7th, including shortly before midnight.

Between 1:00 and 2:00 AM on May 8th, Samuels called Fleming to ask about his van, which was parked outside their house. Fleming said the van was okay, then went back to sleep. Phone records showed that Samuels called Surtain immediately after Fleming hung up, and again nine minutes later. Fleming was later awoken by an explosion, and saw that the van was on fire. Security camera footage showed that two individuals carrying something approached the van that night and broke the passenger window. Shortly thereafter, the van ignited. A fire inspector testified that the arsonists had probably poured a flammable liquid into the car and set fire to it.

After Fleming alerted emergency services, she called Samuels to tell him what had happened. He instructed her to give the firemen and police a piece of paper on which she had, at his direction, written times and dates when he had purportedly received threatening phone calls. Fleming testified that she had never received any threatening phone calls or been present when Samuels received one. Samuels later suggested to his friend, Tony Veal, that the arsonists destroyed the van because they thought Samuels had killed August. Upon being questioned about the threats, Samuels was unable to relate any details about their nature or content.

The fire inspector who examined the van testified that it was abnormally parked in an area where it would not cause Samuels's house to catch fire, but was still in view of the security camera. Samuels stated that he had moved the van between 2:00 and 3:00 PM on May 7th to wash it. The investigator noticed, however, that the closest water spigot was on the corner of the house opposite the van. Samuels reported the fire to his insurance company on May 8th. The insurance company issued a check to him for $4,094, which he later cashed.

Three years after these events took place, Surtain and Marshall were apprehended in a burglary. Acting on information provided by Marshall, the ATF initiated an investigation, during which ATF agents interviewed Samuels about the life insurance policies he had obtained from James. Although he sought to appear cooperative and provided some information about the murder, Samuels told the agents, "I didn't have any life insurance on [August]." The agents knew this statement was false because they had obtained insurance records showing that Samuels's company had paid the premiums. Samuels warned James that agents had interviewed him, and would likely seek to interview James as well. He warned James not to "rat," while at the same time making the motion of pulling a gun trigger.

The government later indicted Samuels, Moss, Surtain, and three other co-defendants. While under indictment, Surtain spoke about his case to his cellmate in St. Bernard Parish Jail, Orlando Brown. He told Brown, inter alia, that his case involved arson and fraud; he was not worried about being convicted because he had disposed of the gun he had used to commit his crime; he had not been charged with murder; he had sent someone to pick up the murder victim; he had "tussled with the guy and then he shot him"; he was not worried about his child's mother or her brother testifying against him because he knew at which jail the brother was being housed; his case involved insurance; his child's mother and her brother were beneficiaries, but he was not a main beneficiary;

and "if everything went right," he would be paid for his part in his crime. He also stated that "they had a policy to get this guy, he was supposed to pick the guy up on his birthday." Insurance records established that August was murdered the day before his twenty-seventh birthday. While he was incarcerated, Surtain made two recorded phone calls—one to Samuels's father and another to Samuels. Surtain asked Samuels's father to tell Samuels that he was "dummying up all the way around," and that it would be best if Samuels would also "dummy up." In Surtain's call to Samuels, they agreed not to cooperate with investigators.

After an eight-day trial, the jury found Surtain and Moss guilty of conspiracy to commit mail and wire fraud, and use of fire to commit obstruction of justice in relation to the van fire. Moss was also found guilty on one count of use of fire to commit mail fraud in relation to the house fire. Samuels was found guilty on all fifteen counts. Once again, these included one count of conspiracy to commit mail and wire fraud, three counts of mail fraud, seven counts of wire fraud, one count of use of fire to commit obstruction of justice, two counts of use of fire to commit mail fraud, one count of making a false statement, and aiding and abetting. 18 U.S.C. §§ 2, 371, 844(h)(1), 1001, 1341, 1343.

Moss and Surtain were respectively sentenced to 420 months' and 180 months' imprisonment. Samuels was sentenced to 900 months' imprisonment. They timely appealed.

## II. DISCUSSION

On appeal, Surtain argues that the evidence was not sufficient to convict him on Count 1 (conspiracy) and Count 12 (use of fire to commit obstruction of justice). Moss also challenges his conviction on Count 12. Samuels raises a host of issues on appeal, including multiplicity, evidentiary sufficiency, improper testimony, failure to sever the defendants' trial, prosecutorial misconduct, and procedural unreasonableness of his sentence. We address each issue in turn.

A.  Surtain's Conspiracy Conviction

1.  Legal Standards

By moving for a judgment of acquittal immediately after the government rested, Surtain properly preserved his evidentiary sufficiency argument. Fed. R. Crim. P. 29(a); United States v. Frye, 489 F.3d 201, 207 (5th Cir. 2007). A challenge to the sufficiency of evidence supporting a criminal conviction is reviewed de novo. United States v. McDowell, 498 F.3d 308, 312 (5th Cir. 2007).

"When reviewing the sufficiency of the evidence, this Court views all evidence, whether circumstantial or direct, in the light most favorable to the Government with all reasonable inferences to be made in support of the jury's verdict." United States v. Moser, 123 F.3d 813, 819 (5th Cir. 1997). "[W]e consider whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Jara-Favela, 686 F.3d 289, 301 (5th Cir. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). "The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." Moser, 123 F.3d at 819.

A conspiracy conviction under 18 U.S.C. § 371 requires proof beyond a reasonable doubt of: "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." United States v. Coleman, 609 F.3d 699, 704 (5th Cir. 2010).

"A jury is free to infer the existence of a conspiracy from the presence, association, and concerted action of the defendant with others." United States v. Curtis, 635 F.3d 704, 719 (5th Cir. 2011) (internal quotation marks and citation

omitted). Knowledge of the conspiracy's unlawful objective "may be inferred from surrounding circumstances." United States v. Grant, 683 F.3d 639, 643 (5th Cir. 2012) (internal quotation marks and citation omitted).

2.    Discussion

Surtain's evidentiary sufficiency challenge focuses on the second conspiracy element. He argues the government failed to establish that he knew August was to be murdered in furtherance of an insurance fraud scheme. We disagree.

Insurance agent James's testimony established the existence of a conspiracy to obtain life insurance proceeds by murdering August. Samuels initially asked his brother Chris to kill August. After Chris failed to do this, Samuels twice called Surtain on the day of August's murder. Other testimony established that, on the night of August's murder, Surtain obtained ammunition from Marshall, was dropped off near the site of August's murder, and later returned to Marshall's friend's house with blood covering his clothes. He later described the murder to Marshall. James testified that Samuels called him shortly after August's death to ask how to submit a life insurance claim.

According to Surtain's cellmate, Brown, Surtain said in jail that he would not be arrested for a murder he had committed because he was not the "main" or "prime" beneficiary of insurance policies on the murder victim's life. Significantly, Surtain told Brown that "they had a policy to get this guy." He also said that if everything went well, he would still get paid. The jury could have inferred that Surtain was promised money for murdering August, and had been told that the money would come from an insurance policy. This inference is strengthened by the fact that Samuels showed his brother the fraudulent insurance policy to induce him to kill August. The jury could have reasonably inferred that Samuels also would have presented the insurance policy to Surtain as proof of payment ability. The evidence thus was sufficient to establish that

Surtain knew the conspiracy's objective was to commit insurance fraud. See Jackson, 443 U.S. at 319.

Surtain attacks Brown's testimony on two grounds. First, he incorrectly contends that the jury was not permitted to rely on Brown's testimony because evidence of Surtain's extra-judicial statements was uncorroborated. We conclude that "substantial independent evidence" justified reliance on Brown's testimony. United States v. Sterling, 555 F.3d 452, 456 (5th Cir. 2009). He accurately related details of the conspiracy that Surtain had provided, and which corresponded with other evidence offered at trial. These included the nature of the charges against Surtain, details of the murder, and Surtain's lack of concern that his "baby mama and her brother" would testify against him. Accordingly, the jury could justifiably rely on Brown's testimony respecting Surtain's jailhouse statements. See id. (federal courts do not apply the traditional corpus delicti doctrine (citing Opper v. United States, 348 U.S. 84, 93 (1954))).

Second, Surtain states in his brief that Brown "agreed that Mr. Surtain had no knowledge of the insurance fraud prior to the death of Mr. August." We can find no record support for this assertion. Surtain also contends that Marshall made the same representation. Although Marshall testified that Surtain had not mentioned anything to him about an insurance scam, Marshall never affirmatively stated that Surtain had no knowledge of the scam. Moreover, it is unclear how Marshall might have obtained such knowledge.

B.    Surtain's and Moss's Use-of-Fire Convictions

1.    Legal Standards

Because Moss and Surtain preserved their evidentiary sufficiency argument as to Count 12 (use of fire to commit obstruction of justice and aiding and abetting), we apply de novo review, viewing all evidence in the light most favorable to the verdict. McDowell, 498 F.3d at 312; Moser, 123 F.3d at 819. We "must affirm if any reasonable construction of the evidence could establish the

defendant's guilt beyond a reasonable doubt." United States v. Booker, 334 F.3d 406, 409 (5th Cir. 2003) (internal quotation marks and citation omitted).

A conviction under 18 U.S.C. § 844(h)(1) for use of fire to commit a felony requires sufficient proof that the defendant (1) used fire (2) to commit a felony that can be prosecuted in a court of the United States. United States v. Nguyen, 28 F.3d 477, 481 (5th Cir. 1994). A person commits obstruction of justice when he "corruptly alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding." 18 U.S.C. § 1512(c)(1).

The federal aiding and abetting statute provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2. A conviction under this provision requires sufficient proof that "the elements of the substantive offense occurred and that the defendant associated with the criminal venture, purposefully participated in the criminal activity, and sought by his actions to make the venture succeed." United States v. Garcia, 242 F.3d 593, 596 (5th Cir. 2001).

2.    Discussion

The government argues that Moss counseled Samuels to destroy the van, which permitted Moss's use-of-fire conviction on an aiding-and-abetting theory.[1] 18 U.S.C. § 2. It relies on evidence showing that (1) Moss had a strong motive to destroy the murder evidence in the van; (2) Moss placed a five-minute phone call to Samuels approximately five-and-a-half hours before the van was burned; and (3) Moss was returning a call that Samuels had placed to Moss's "burner" cell

---

[1] Although the district court gave the jury a co-conspirator liability instruction, it specifically instructed the jury that the instruction applied only to Counts 2 through 11. Accordingly, we will not consider co-conspirator liability with respect to Count 12. See United States v. Crain, 33 F.3d 480, 486 n.7 (5th Cir. 1994) (citing Pinkerton v. United States, 328 U.S. 640, 645 (1946)).

phone, which had been used only in connection with criminal activity. As we will discuss, the evidence was sufficient to convict Moss on Count 12.

As outlined above, the trial evidence established that Moss had driven August to the murder site in the van, and that Surtain had killed him. James testified that Samuels told him he had cleaned blood out of the van shortly after August's murder. Because the blood could have linked all three defendants to August's murder and the related insurance fraud scheme, the jury could have inferred that they had an overwhelming motive to destroy this evidence.

Viewed in the light most favorable to the verdict, the phone calls from Samuels's phone show that he was urgently trying to contact Moss on the night of the van fire. Moss had returned to Detroit on April 26, 2004. Samuels called Moss's cell phone at 9:23 PM on May 7th, then checked his voicemail. He called Moss's girlfriend four minutes later, and spoke with her for two minutes. Immediately after this call, Samuels called a house near Detroit. Records showed a call from Moss to his girlfriend at 9:30. Samuels called Surtain at 9:31. Moss called Samuels's house at 9:33, just after Samuels had returned home. The two spoke for five minutes, and Samuels left immediately after the call ended. Between Moss's departure from New Orleans and that night, Samuels and Moss had called each other four times—three times on the night Moss left for Detroit (a one-minute call, and two calls in quick succession several hours later, lasting seven seconds and fifty-five seconds), and once on May 1st (one minute).

The phone at which Samuels first tried to reach Moss is also significant. Phone records showed that Surtain and Samuels tended to call this phone—a "burner" cell phone with an Indianapolis area code—only during periods when they were involved in criminal activity in which Moss also participated, including in the days leading up to August's murder. The defendants further highlighted this phone's significance by denying their knowledge of the phone or its connection to Moss. Surtain told investigators that the phone number was

14

associated with a woman he had met at the New Orleans Convention Center. Although Moss's ex-wife testified that Moss had used this phone to call her, he told investigators he had no knowledge of the phone number associated with it. He went so far as to deny having had any cell phone in April 2004, even though Samuels made calls to his phone at that time. Viewed in the light most favorable to the verdict, Samuels's calling this phone indicated that he wished to discuss criminal activity with Moss.

Moreover, the jury could have reasonably inferred that Moss was Samuels's go-to man for advice about incendiary devices. After all, Samuels had summoned him from Detroit to New Orleans to burn down the Landry house. True, the fact that Moss set his own hair on fire in that incident implies that Samuels's confidence in him might have been misplaced, but the point stands that Samuels knew Moss to have experience with setting things on fire.

Although the jurors did not know and could not have known with certainty the content of the phone conversation, they hardly could have believed that Samuels called Moss to discuss the weather. Samuels had not spoken with Moss in days, yet he suddenly and urgently sought to contact Moss mere hours before the van fire. Given the strong inference that they spoke about the van fire, and Moss's overwhelming motive to destroy the murder evidence, the jury could have found beyond a reasonable doubt that Moss, at minimum, gave words of encouragement to Samuels in violation of the federal aiding-and-abetting statute. See United States v. Gulley, 526 F.3d 809, 816 (5th Cir. 2008) ("An aider and abettor is liable for criminal acts that are the 'natural or probable consequence of the crime' that he . . . encouraged." (citation omitted)); United States v. Bowen, 527 F.3d 1065, 1078 (10th Cir. 2008) ("Even mere 'words or gestures of encouragement' constitute affirmative acts capable of rendering one liable under this theory." (citation omitted)).

Moss argues that (1) the jury's verdict "rest[ed] on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference," United States v. Rojas Alvarez, 451 F.3d 320, 333 (5th Cir. 2006) (citation omitted); (2) his conviction must be reversed because there is no evidence of what he discussed with Samuels on May 7th; and (3) he could not have abetted Samuels's offense because Samuels had already resolved to destroy the van. See United States v. Powers, 168 F.3d 741, 746–47 (5th Cir. 1999); United States v. Galvan, 693 F.2d 417, 419–20 (5th Cir. 1982); Grimes v. United States, 379 F.2d 791, 795 (5th Cir. 1967). We disagree.

"[W]hat the fact finder is permitted to infer from the evidence in a particular case is governed by a rule of reason, and . . . fact finders may properly use their common sense and evaluate the facts in light of their common knowledge of the natural tendencies and inclinations of human beings." United States v. Ayala, 887 F.2d 62, 67 (5th Cir. 1989) (internal quotation marks and citation omitted). "[C]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." Id. (quoting Coggeshall v. United States (The Slavers), 69 U.S. (2 Wall.) 383, 401 (1865)). Given Moss's overwhelming motive to destroy the murder evidence, the jury could have reasonably inferred that Moss sought to embolden Samuels in this venture, even if only briefly during their five-minute conversation. Samuels's abruptly leaving his home after speaking with Moss—only minutes after having arrived there—fits the narrative of a man who has just obtained something he wanted or needed to accomplish his mission.

Moreover, Moss's reliance on Powers, Galvan, and Grimes is misplaced. In each of those cases, we reversed a conviction that was based primarily on evidence that a phone call or phone calls had taken place. Powers, 168 F.3d at 746–47; Galvan, 693 F.2d at 419–20; Grimes, 379 F.2d at 795. Moss argues that

these cases stand for the proposition that "telephone records are not, standing alone, sufficient evidence to support a" conviction. *United States v. Williams*, 264 F.3d 561, 574 (5th Cir. 2001) (citing *Powers*, 168 F.3d at 746–47; *Galvan*, 693 F.2d at 419). The instant matter is distinguishable, however, because the government offered more than "telephone records . . . standing alone." There is strong circumstantial evidence of what Moss and Samuels discussed, and the jury could have inferred from Moss's overwhelming motive and Samuels's behavior after their phone call that Moss encouraged Samuels to destroy his van at some point during their not all too brief conversation.

Finally, Moss argues that he could not have helped the van fire to succeed because Samuels had already decided to destroy the van: Samuels had increased the van's insurance coverage days before, and parked it away from the house earlier that day. We agree that the evidence shows Samuels likely would have destroyed the van even if he had not been able to contact Moss. Nonetheless, conviction on an aiding-and-abetting theory does not require the defendant's acts to cause the criminal venture to succeed. It requires only association with the criminal venture, purposeful participation therein, and an affirmative act meant to make the venture succeed. *Garcia*, 242 F.3d at 596. There was sufficient proof that Moss satisfied these elements.

As for Surtain, he and Samuels called each other twenty-six times on May 7th, including shortly before midnight. Samuels called his girlfriend at 1:06 AM and 1:12 AM on May 8th to ask if his van was okay; she said it was. Immediately after the 1:12 phone call, Samuels called Surtain, and called him again at 1:22 AM. The van fire occurred at about 3:00 AM.

Surtain dismisses the large volume of calls between him and Samuels as a natural result of their relationship. Samuels was Surtain's drug dealer and the brother of his child's mother. Using their common sense, however, the jurors could have found that even ties as close as these did not explain the flurry of

phone calls on May 7th, and that it was no coincidence they occurred the day before the van fire. Moreover, Samuels's relationship with Surtain does not explain why Samuels twice called Surtain just after he learned his van was still intact. This, combined with Surtain's strong motive to destroy the murder evidence, permitted the jury reasonably to infer that Surtain had encouraged Samuels during their phone calls to destroy the van. Accordingly, we will not reverse Surtain's conviction on Count 12.

## C. Samuels's Use-of-Fire Convictions

Samuels argues that his two use-of-fire convictions and sentences that arose from the van fire must be vacated as multiplicitous. Samuels contends that a single fire cannot give rise to separate convictions under § 844(h)(1), even if that fire facilitated separately chargeable offenses—in this case, mail fraud and obstruction of justice. 18 U.S.C. §§ 1341, 1512(c)(1). As we will discuss, we will vacate Samuels's use-of-fire sentences because Congress did not clearly state its intent to impose multiple punishments under § 844(h)(1) in the instant circumstances.

### 1. Legal Standards

Because Samuels did not raise a multiplicity objection before trial, he has waived this challenge as to his use-of-fire convictions. See Fed. R. Crim. P. 12(b)(3)(B); United States v. Soape, 169 F.3d 257, 265–66 (5th Cir. 1999). He can challenge the multiplicity of his sentences for the first time on appeal, however, because they are to run consecutively to each other and to his other sentences, and separate monetary assessments were imposed as to each conviction. See United States v. Marroquin, 885 F.2d 1240, 1246 (5th Cir. 1989). We apply plain-error review because Samuels raised no objection at sentencing. United States v. Ogba, 526 F.3d 214, 232 (5th Cir. 2008).

Section 844(h)(1) provides as follows:

Whoever uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States . . . including a felony which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years. In the case of a second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for 20 years. Notwithstanding any other provision of law, . . . the term of imprisonment imposed under this subsection [shall not] run concurrently with any other term of imprisonment including that imposed for the felony in which the explosive was used or carried.

2.      Discussion

"In general, 'multiplicity' is the charging of a single offense under more than one count of an indictment." Soape, 169 F.3d at 266. "The rule against multiplicity is grounded in the Fifth Amendment's prohibition against double jeopardy . . . ." United States v. Buchanan, 485 F.3d 274, 278 (5th Cir. 2007) (internal quotation marks and citation omitted). A multiplicity violation arises, inter alia, when the government has impermissibly divided a single criminal act or transaction into multiple violations, and separately charged each one under the same provision. See id. at 278–79. Here, the government argues that a single fire occasioned by Samuels permitted separate punishments under § 844(h)(1) because it helped him to commit separately chargeable felonies.

We confronted similar circumstances in United States v. Evans, 854 F.2d 56 (5th Cir. 1988), rev'g in part 848 F.2d 1352 (5th Cir. 1988). In Evans, the defendant had presented false identification to obtain a firearm and ammunition in a single transaction. 848 F.2d at 1354. She was convicted for two violations of 18 U.S.C. § 922(a)(6), which prohibits exhibiting "false, fictitious, or misrepresented identification" "in connection with the acquisition . . . of any firearm or ammunition." In addressing the defendant's double jeopardy challenge, we concluded that the dispositive question was whether Congress had

intended to "punish as two offenses the single making of one false statement in connection with one purchase on the same occasion of both a firearm and ammunition." Evans, 854 F.2d at 58. This requires us to determine "[w]hat Congress has made the allowable unit of prosecution." Id. at 59 (quoting United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221 (1952)). If the statutory text and legislative history are not dispositive of Congress's intent, we apply the rule of lenity, resolving the multiple-punishment question in the defendant's favor. Id. (citing Ladner v. United States, 358 U.S. 169, 177 (1958); Bell v. United States, 349 U.S. 81, 84 (1955)).

As set out above, § 844(h)(1) provides penalties for any person who "uses fire or an explosive to commit any felony." The government implicitly argues that "use of fire" is the proper unit of prosecution, and that Congress thus intended multiple punishments in Samuels's circumstances. This interpretation is not unreasonable; after all, Samuels "used fire" to commit mail fraud, and also "used fire" to obstruct justice. Nonetheless, because the more lenient statutory construction is no less plausible, we must apply the rule of lenity.

In United States v. Phipps, 319 F.3d 177, 186–89 (5th Cir. 2003), the government offered a similar interpretation with respect to 18 U.S.C. § 924(c)(1). Section 924(c)(1) provides punishment for any person who "uses or carries a firearm" "during and in relation to any crime of violence or drug trafficking crime." The defendant in Phipps had committed two violent crimes—carjacking and kidnaping—through the single "use" of a firearm. 319 F.3d at 186. After examining § 924(c)(1)'s text and legislative history, we held that Congress's intent as to the "unit of prosecution" was ambiguous, thus compelling us to apply the rule of lenity. Id. at 187–88. Accordingly, we held that the applicable unit of prosecution was "the use, carriage, or possession of a firearm during and in relation to a predicate offense." Id. at 186. Because § 844(h)(1)'s text parallels

that of § 924(c)(1) in relevant part, the applicable unit of prosecution would also appear to be the pairing of a "use" and a "felony." See Phipps, 319 F.3d at 186.

The government argues that its interpretation is supported by § 844(h)(1)'s requirement that punishment under that provision be served consecutively to any term of imprisonment imposed for the underlying felony. Section 924(c)(1) also imposes consecutive punishment, however, and we considered and rejected the same argument in Phipps, 319 F.3d at 187. Although this requirement undoubtedly evinces an intent to impose harsh punishment for § 844(h)(1) violations when they occur, it does not establish what constitutes a violation. Because we perceive no other part of the statutory text that materially distinguishes § 844(h)(1) from § 924(c)(1), we are not compelled to reach a result different from the one we reached in Phipps.

Nor does § 844(h)(1)'s legislative history provide relevant instruction. It reveals only that Congress wished to discourage the widespread use of explosive and incendiary devices to accomplish criminal objectives. As we explained in Phipps, 319 F.3d at 187, such an expression of intent does not resolve the ambiguity that confronts us. See Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922, 957 (codified as amended in scattered sections of 18 U.S.C.); H.R. Rep. No. 91-1549 (1970), reprinted in 1970 U.S.C.C.A.N. 4007; see also Anti-Arson Act of 1982, Pub. L. No. 97-298, 96 Stat. 1319 (adding "fire" to 18 U.S.C. § 844); H.R. Rep. No. 97-678 (1982), reprinted in 1982 U.S.C.C.A.N. 2631. Likewise, the legislative history of § 924(c)—the provision on which § 844(h) was originally modeled, H.R. Rep. No. 91-1549, at 69—does not answer this question. See Phipps, 319 F.3d at 186–87 & n.6; Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1224 (codified at 18 U.S.C. § 921 et seq.); S. Rep. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112.

Further supporting our decision today, we held in United States v. Severns, 559 F.3d 274, 291 (5th Cir. 2009), that a single "fire incident" did not support

multiple sentences under § 844(h)(1), even when that fire furthered multiple predicate offenses. In Severns, the government charged two § 844(h)(1) violations after the defendant burned down her gun store in furtherance of one mail fraud and one wire fraud offense. Analogizing the use-of-fire provision to § 924(c)(1), we held that the defendant "may be prosecuted and punished for use of fire to commit mail fraud or use of fire to commit wire fraud, but not both." Severns, 559 F.3d at 291.

The government argues that Severns is inapposite because the underlying mail and wire fraud offenses in that case were committed to achieve the same objective—to obtain fire insurance proceeds from the gun store's destruction. 559 F.3d at 276–77. It contends that Samuels's distinct criminal objectives in burning his van—to destroy evidence and fraudulently obtain insurance proceeds—permit a different result. Based on our § 924(c)(1) caselaw, we cannot accept this reasoning. In United States v. Walters, 351 F.3d 159, 161 (5th Cir. 2003), the defendant was convicted on two § 924(c)(1) charges for a single bombing, the predicate offenses being assaulting the federal officer who had opened the explosive package and damaging the federal building in which the package was opened. 18 U.S.C. §§ 111, 844(f). We rejected the government's argument that "dual criminal purposes" supported multiple punishments under § 924(c)(1), and vacated the defendant's sentences. Walters, 351 F.3d at 173 (citing Phipps, 319 F.3d at 183). In light of § 844(h) and § 924(c)(1)'s parallel textual structures, the identical purpose motivating each provision's enactment, H.R. Rep. No. 91-1549, at 69, and our past reliance on the latter provision to interpret the former, Severns, 559 F.3d at 291, we have ample reason to extend the Walters court's holding to the instant matter.

Thus, applying the rule we articulated in Evans, 854 F.2d at 59, and reiterating our decision in Severns, 559 F.3d at 291, we hold that it was error to impose multiple sentences under § 844(h)(1) based on a single "fire incident" that

22

facilitated two underlying felonies. That Samuels had multiple criminal objectives in causing the fire does not alter this result.

### 3. Plain-Error Review

Having held that it was error to impose a sentence on each of Counts 12 and 13, we must now determine whether this error was plain, and whether to correct it. To establish plain error, Samuels must show that "(1) there is error; (2) the error was clear and obvious, not subject to reasonable dispute; and (3) the error affected his substantial rights." United States v. Hebron, 684 F.3d 554, 558 (5th Cir. 2012). We may "remedy the error, but only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.

Whether an error is "clear and obvious" depends on the clarity of applicable law. See United States v. Meza, 701 F.3d 411, 434 (5th Cir. 2012) (vacating the defendant's multiplicitous sentences sua sponte because the error was "clear in light of" controlling authority). "[T]he focus of plain error review should be whether the severity of the error's harm demands reversal, and not whether the district court's action . . . deserves rebuke." United States v. Escalante-Reyes, 689 F.3d 415, 423 (5th Cir. 2012) (en banc) (citation omitted). We have found plain error when there was "no relevant distinction[]" between the case at bar and controlling precedent. Meza, 701 F.3d at 433.

The government has correctly noted that the facts in Severns are somewhat different from those present in the instant matter. We think, however, that this difference is so slight, the controlling rule in Severns so clear, the weight of Walters so one-sided, and an expression of legislative intent supporting the government's position so lacking, that the decision we have reached today was all but certain. Moreover, this error severely affects Samuels's substantial rights. Our view of his conduct in this matter notwithstanding, we cannot allow an additional twenty-year term of imprisonment to be imposed when controlling authority so clearly establishes its illegality. Accordingly, we will vacate his

23

sentences on Counts 12 and 13, remand for dismissal of one of these counts (at the election of the government), and order resentencing. Meza, 701 F.3d at 434. We deem the conviction on the remaining count affirmed. See id.

D.     Samuels's Mail Fraud Convictions

1.     Standard of Review

Samuels argues that the evidence did not support his mail fraud convictions on Counts 3 and 4. He contends that the mailings underpinning these convictions were not made in furtherance of the life insurance fraud.[2]

Although the government contends that plain-error review applies, we will review Samuels's sufficiency claim de novo. First, he properly moved for a judgment of acquittal at the close of the government's evidence, and renewed his motion following the defense case. See United States v. Hale, 685 F.3d 522, 543 (5th Cir. 2012). Each defendant offered sufficiency motions and arguments following the government's case. After the court denied the motions, the defendants presented their evidence. Moss and Surtain renewed their Rule 29 motions after they rested, but before Samuels presented all of his evidence. Samuels rested the following day; the parties then gave closing arguments, and the court held the charging conference. On January 20th, before jury instructions were given, all three defendants renewed their Rule 29 motions.

Second, although Samuels presented specific arguments as to sufficiency (thereby waiving all other sufficiency arguments he failed to raise as to the counts he addressed, see United States v. Phillips, 477 F.3d 215, 219 (5th Cir. 2007)), he adopted Surtain's argument as to Counts 3 and 4 without objection. Following Surtain's Rule 29 arguments, including his argument respecting Counts 3 and 4, Samuels's counsel told the prosecutor, "I thought I had adopted

---

[2] By our reckoning, vacating either or both of these convictions would not alter the length of Samuels's prison term. Because separate monetary assessments were imposed as to each count of conviction, however, we cannot dispose of Samuels's challenge under the concurrent sentence doctrine. See United States v. Dixon, 273 F.3d 636, 641–42 (5th Cir. 2001).

Mr. Surtain's argument." This prompted no objection. He later told the court—again, without objection—that "many of the arguments have already been addressed relative to Jermaine Surtain and they apply to my client," and then offered additional sufficiency arguments.[3] The court denied the Rule 29 motions only after hearing all three defendants' arguments and the government's response.

We have held that absent the government's objection, denial by the trial court, or "exceptional circumstances" that cause the procedure to mislead the court or the prosecutor, a defendant may adopt a co-defendant's objection to jury instructions. See United States v. Bernal, 814 F.2d 175, 182 & n.14 (5th Cir. 1987). As we will explain, there are compelling reasons to apply this approach here. The government has not noted any "exceptional circumstances" that would render Samuels's adoption of Surtain's arguments misleading, nor are any apparent from the record.

The government argues we should extend to the error-preservation context our rule that an appellant may not adopt evidentiary sufficiency arguments from his co-defendant's appellate brief. See United States v. Solis, 299 F.3d 420, 444 n.70 (5th Cir. 2002) (applying Fed. R. App. P. 28(i)). The concern that motivates this rule—the fact-specific nature of sufficiency arguments—is not implicated here. Because Surtain's sufficiency argument went to the nature of the insurance company's mailings that underlay Counts 3 and 4, and included no circumstances or reasoning unique to Surtain, it applied with equal force to Samuels. His adoption of Surtain's argument thus satisfied the purpose of the specificity rule, which is merely to ensure "that the Government and district court are provided notice." McDowell, 498 F.3d at 312.[4] Indeed, for error-

---

[3] Earlier, Moss also adopted Surtain's argument. The government did not object.

[4] One of our sister circuits has apparently interpreted McDowell's discussion of the specificity rule as contradicting the rule that a general challenge to evidentiary sufficiency

preservation purposes, we have recognized a defendant's adoption of her co-defendant's severance argument below, United States v. Whittington, 269 F. App'x 388, 400 (5th Cir. 2008), notwithstanding our rule that severance arguments cannot be adopted by reference in an appellate brief because—like sufficiency arguments—they are "fact-specific," Solis, 299 F.3d at 441 n.46.

As with jury instruction objections, holding that a defendant may "properly rely only upon his own" Rule 29 arguments when his co-defendant's circumstances are indistinguishable would force trial courts needlessly to endure duplicative sufficiency arguments. See Bernal, 814 F.2d at 182. If we adopted the government's position, consistency of logic might require us also to hold that to renew a Rule 29 motion, a defendant must repeat in full the sufficiency arguments he offered following the government's case. In multi-defendant cases, the amount of repetition necessary to preserve error for appeal would turn trial proceedings into tedious theaters of the absurd. Because a reasonable trial judge can hardly be expected to tolerate this, the opportunity to make Rule 29 arguments might well be denied altogether, thus preserving de novo review for these arguments in any event. See Fed. R. Crim. P. 51(b).

---

preserves de novo review as to all potential sufficiency issues. United States v. Marston, 694 F.3d 131, 134 & n.2 (1st Cir. 2012); see also 2A Charles Alan Wright & Peter J. Henning, Federal Practice and Procedure § 466 (4th ed. 2009).

We wish to clarify that in McDowell, as in this case, we were merely applying the widely recognized rule that if a defendant asserts a specific sufficiency argument as to a specific count in a Rule 29 motion, he waives all other sufficiency arguments that he has not raised as to that count. 498 F.3d at 312; see also Marston, 694 F.3d at 134 & n.2 (collecting cases); 2A Wright & Henning, supra, § 466 & n.2. We can find no decision in which we have adopted the First Circuit's apparent reading. Although a panel of this court has suggested that McDowell "arguably" supports that reading, that panel implicitly rejected this view by applying de novo review to a general sufficiency challenge. United States v. Job, 387 F. App'x 445, 456 (5th Cir. 2010). And though we have held that a sufficiency argument respecting venue is not imported by a general sufficiency argument, United States v. Carbajal, 290 F.3d 277, 288–89 & n. 19 (5th Cir. 2002), other circuits recognize this gloss on the general rule as well. See 2A Wright & Henning, supra, § 466 & n.9.

Notably, Samuels has not enlarged his argument on appeal to make light of any circumstances unique to himself. Cf. United States v. Marquez-Rendon, 405 F. App'x 898, 901 (5th Cir. 2010) (applying plain-error review when appellant's argument on appeal differed from the argument of his co-defendant that he had adopted below). In these circumstances, Samuels has not raised his sufficiency argument "for the first time on appeal." United States v. Bueno, 585 F.3d 847, 849 (5th Cir. 2009). Review thus should not be limited to plain error.

The government further contends that Samuels waived his sufficiency argument because his co-defendants filed written, post-trial Rule 29 motions, but he did not. See Fed. R. Crim. P. 29(c) (a defendant "may" file a post-verdict acquittal motion). The government offers no authority supporting the notion that preservation of a Rule 29 argument requires more than a motion for acquittal at the close of the government's case and renewal of that motion following the defense case. See Hale, 685 F.3d at 543. Nor does the government offer any support for its apparent view that Samuels's Rule 29 motion had to be in writing. See 2A Wright & Henning, supra, § 466 (if made during trial, a Rule 29 motion need not be in writing).

## 2.    Mail Fraud Elements

A mail fraud conviction under 18 U.S.C. § 1341 requires sufficient proof that: "(1) the defendant devised or intended to devise a scheme to defraud, (2) the mails were used for the purpose of executing, or attempting to execute, the scheme, and (3) the falsehoods employed in the scheme were material." United States v. Ratcliff, 488 F.3d 639, 643–44 (5th Cir. 2007). "One 'causes' the mails to be used '[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen.'" United States v. Ingles, 445 F.3d 830, 835 (5th Cir. 2006) (alteration in original) (quoting Pereira v. United States, 347 U.S. 1, 8–9 (1954)). The material that has been mailed need not be "fraudulent in itself."

United States v. Shively, 927 F.2d 804, 814 (5th Cir. 1991) (citation omitted). Decisions construing the wire fraud statute are equally applicable to matters involving the mail fraud statute. United States v. Mills, 199 F.3d 184, 188 (5th Cir. 1999) (per curiam) (citing Carpenter v. United States, 484 U.S. 19, 25 n.6 (1987)).

### 3.    Discussion

The mailings in Counts 3 and 4 were related to the life insurance scheme. As alleged in the superseding indictment, the objective of this scheme was to obtain life insurance proceeds from August's death. The mailing underlying Count 3 was a letter the insurance company sent to Samuels's mother—the other beneficiary on the policy—informing her that her claim had been denied because material information respecting August's medical history had been omitted from the application. The letter also noted that Samuels had not filed his claim, but invited him to present evidence that the decision to deny benefits was in error. As alleged in Count 4, the insurance company then mailed a check to Samuels and his mother to refund the insurance premiums plus accrued interest. Samuels's mother deposited the refund check, but Samuels did not. Samuels concedes the fact of these mailings, and does not deny that he knew mailings would take place after he applied for the policy. He argues instead that these mailings did not advance the scheme's objective. See Ratcliff, 488 F.3d at 643–44.

The Supreme Court has held that the mailing element is not satisfied merely because a mailing resulted from the defendant's fraudulent scheme; rather, the mailing must be used "for the purpose of executing" the scheme. United States v. Maze, 414 U.S. 395, 405 (1974) (quoting 18 U.S.C. § 1341); see also Schmuck v. United States, 489 U.S. 705, 723 (1989) (Scalia, J., dissenting) ("[I]t is mail fraud, not mail and fraud, that incurs liability."). A mailing is used for the purpose of executing the scheme when it is "incident to an essential part

of the scheme." Schmuck, 489 U.S. at 712 (quoting Pereira, 347 U.S. at 8). Although "[i]t is not necessary that the scheme contemplate the use of the mails as an essential element," Pereira, 347 U.S. at 8, we have held that "completion of the alleged scheme must depend in some way on the information or documents that passed through the mail." United States v. Tencer, 107 F.3d 1120, 1125 (5th Cir. 1997).

A mailing is incident to an essential part of the scheme when, inter alia, it aids or is intended to aid the defendant in achieving the scheme's objective. Thus, a defendant's mail fraud conviction was affirmed when he tricked his wealthy spouse into writing him a check that was then mailed to him in the ordinary course of business. Pereira, 347 U.S. at 8. In Carpenter, 484 U.S. at 28, the mailing of newspapers that included stock tips the defendant had earlier leaked to co-conspirators satisfied the mailing element because the movement of stock prices necessary for the scheme's success would not have occurred absent the stock tips' broad circulation. A mailing is sufficient also when it helps the defendant to perpetuate an ongoing scheme. In Schmuck, 489 U.S. at 711–12, a car dealer rolled back car odometers, then sold the cars to unwitting retail dealers. The underlying mailings were of title-registration documents that the retail dealers sent to the state department of transportation to register the vehicles after customers purchased them. Id. at 707, 712. If the purchasing dealers had not continued to mail the title documents throughout the scheme's fifteen-year operation, the defendant could not have continued to obtain illegitimate proceeds. Id. at 712.

In the instant matter, the government argues that the denial-of-claim letter in Count 3 satisfied the mailing element because the insurance company invited Samuels to submit any further information that might cause it to reconsider its decision to deny benefits. Samuels contends that this mailing was insufficient because it signaled the fraud's failure and served only to frustrate

his scheme. See, e.g., United States v. Koen, 982 F.2d 1101, 1107 (7th Cir. 1992); United States v. LaFerriere, 546 F.2d 182, 187 (5th Cir. 1977).

The Second and Seventh Circuits have upheld mail fraud convictions in factually similar scenarios. In United States v. Bortnovsky, 879 F.2d 30, 32 (2d Cir. 1989), the defendants had submitted fraudulent fire loss claims after burning their clothing store. An adjuster mailed a letter advising them that their claim had not been settled, and that they would have to take certain steps to avoid losing their rights, including filing a lawsuit before a certain date. Id. at 35–36. The court held that this mailing helped to advance the scheme because "it advised the defendants of another route by which they might recover the funds . . ., the normal claims processing having proven unsuccessful." Id. at 40. It further noted that mailings "sent as part of the business of processing a claim or transaction have generally been held to be 'incident to an essential part of the scheme.'" Id.; see also United States v. Contenti, 735 F.2d 628, 632 (1st Cir. 1984) (an insurance company's letter acknowledging receipt of the defendant's proof of loss satisfied the mailing element because it furthered processing of the claim). In United States v. Draiman, 784 F.2d 248, 253 (7th Cir. 1986), the court considered an insurance company's letters informing the defendant that his "proofs of loss and supporting documentation [were] not sufficient and requesting clarification." The court affirmed the mail fraud conviction, reasoning that the defendant "was continuing to try to collect, and these letters helped give him another chance." Id. Finally, United States v. Kuzniar, 881 F.2d 466, 472 (7th Cir. 1989), concerned an insurance company's letters to the defendants informing them that they would have to sit for depositions and produce certain documents to collect on their fire insurance policy. The court upheld the mail fraud convictions because the defendants' failure to attend the depositions or produce supporting documents would have been fatal to their scheme's eventual success. Id.

30

The instant matter differs from the cases we have discussed in that those cases involved either successful schemes or defendants who persisted in the face of apparent setbacks. In contrast, Samuels arrested his scheme after the insurance company informed him that the policy application was defective. But a scheme's failure does not necessarily invalidate a mail fraud conviction. See 18 U.S.C. § 1341 (prohibiting use of the mails for the purpose of executing or attempting to execute a fraudulent scheme); Adjmi v. United States, 346 F.2d 654, 657 (5th Cir. 1965); see also United States v. Loney, 959 F.2d 1332, 1337 n.14 (5th Cir. 1992) (wire fraud). Nor do we think that Samuels's decision to end the scheme after receiving this letter invalidates his conviction. As the Second and Seventh Circuits have recognized, a would-be insurance scammer must expect that as a normal part of the claims process—or, stated differently, as a "step in [the] plot"—he will be required to prove his claim's legitimacy. Schmuck, 489 U.S. at 711 (alteration in original) (citation omitted). Here, the insurance company invited Samuels to offer evidence that its decision to deny benefits was incorrect, and thus potentially to obtain the insurance proceeds he sought. Because a reasonable jury could have concluded that Samuels expected this type of mailing when he initially hatched his plot, we do not believe it relevant that the insurance company's invitation turned out to be too tall an order for him. See Schmuck, 489 U.S. at 715 (a mailing that later proves to be "counterproductive" does not invalidate a mail fraud conviction if it "is part of the execution of the scheme as conceived by the perpetrator at the time"); Kuzniar, 881 F.2d at 472–73 (rejecting the argument that the defendants' obligation to prove their claim made it more difficult to collect insurance proceeds).

To be clear, we do not depart from the widely recognized rule that a mailing that serves only to frustrate a scheme does not support a mail fraud conviction. See, e.g., United States v. Frey, 42 F.3d 795, 798 (3d Cir. 1994). We conclude only that when an insurance fraud defendant receives a mailing falling

within a category of communications that support a mail fraud conviction and that he expected to receive as a normal part of the claims process, and which presents him with the choice to move forward with his fraud or end it, he cannot avoid liability simply because he takes the latter course. A defendant's belated realization that he is in over his head has no bearing on whether a mailing was "incident to an essential part of the scheme" as originally conceived. See Schmuck, 489 U.S. at 712, 715.

Although the Count 3 mailing supports a mail fraud conviction, the Count 4 mailing does not. The government suggests, without elaboration, that this mailing helped Samuels to achieve the scheme's purported objective—obtaining a refund of the insurance premiums plus accrued interest. Even ignoring that this theory blatantly mischaracterizes the objective that the government itself set out in the superseding indictment—to obtain life insurance benefits—we cannot countenance this theory. No reasonable juror could have found that Samuels concocted an elaborate scheme to obtain a premium refund—i.e., money he already possessed before submitting it to the insurance company—or to obtain a few dollars in accrued interest. Samuels surely would not have gone to the trouble of falsifying an insurance application, ensuring that August could not discover the policy, luring the insurance salesman into the scheme, hiring a hitman, constructing an alibi, and killing his cousin to obtain mere interest when he could have achieved the same by opening a savings account (an endeavor that would have taken him all of ten minutes). There is quite simply no evidence supporting the notion that Samuels concocted his scheme to obtain a refund or interest. See Schmuck, 489 U.S. at 715 (the mailing must be "part of the execution of the scheme as conceived by the perpetrator at the time" (emphasis added)); United States v. Rochester, 898 F.2d 971, 977 (5th Cir. 1990) (defendant must act with specific intent that the scheme's illicit objectives be

32

achieved). The uncontradicted evidence showed that, from start to finish, the scheme was directed only at obtaining insurance proceeds.

Viewing the evidence in the light most favorable to the verdict, Moser, 123 F.3d at 819, we conclude that a reasonable juror could have found that the denial-of-claim letter satisfied the mailing element of a mail fraud offense. Under the same standard, however, we conclude that the refund check mailing did not support a finding of guilt.

E.    Brown's Testimony

Samuels argues that the district court plainly erred by allowing Brown (Surtain's cellmate) to offer incriminating testimony against him. As discussed above, Brown testified that Surtain had told him: (1) He would not be found guilty because he disposed of the gun used in the murder; (2) he was not worried that "his baby mama and her brother" would testify against him because he could "get to" the brother; and (3) he was not concerned about being connected to the insurance fraud because he was not "a main beneficiary on the policies," although the person "that was in St. Charles [Parish Jail]" was a beneficiary.

Samuels contends that, although his name was not explicitly mentioned in these statements, they nevertheless implicated him in Surtain's crimes because he was the person referred to as the "brother" and the person "in St. Charles." Samuels further asserts that this testimony amounted to inadmissible hearsay, and violated his rights to confrontation, due process, and a fair trial. Samuels concedes that plain-error review applies. United States v. Vargas-Soto, 700 F.3d 180, 182 (5th Cir. 2012).

Because the statements at issue are nontestimonial, we reject Samuels's Confrontation Clause argument. See Davis v. Washington, 547 U.S. 813, 825 (2006) (statements made by one prisoner to another are "clearly nontestimonial"). "[A] statement that is not testimonial cannot violate the

Confrontation Clause." Brown v. Epps, 686 F.3d 281, 286 (5th Cir. 2012) (alteration in original) (citation omitted); see also Davis, 547 U.S. at 823–24.

Samuels also argues that the admission of Brown's statements violated his rights to due process and a fair trial because Brown's testimony was "unreliable" and "extremely prejudicial." Samuels relies on Bruton v. United States, 391 U.S. 123, 126 (1968), in which the Supreme Court held that a non-testifying co-defendant's confession inculpating the other defendant was inadmissible at their joint trial.[5] Samuels ignores that the Bruton rule "is a narrow one that applies only to statements that directly implicate the defendant without reference to other admissible evidence." United States v. Jimenez, 77 F.3d 95, 98 (5th Cir. 1996). In other words, we have consistently held that Bruton "is not violated unless a co-defendant's statement directly alludes to the complaining defendant." United States v. Espinoza-Seanez, 862 F.2d 526, 534 (5th Cir. 1988) (citation omitted) (collecting cases). Indirect references do not implicate Bruton. Id.

Here, Brown's testimony does not directly implicate Samuels as a participant in the criminal activity for which he was convicted. Brown's first statement—that Surtain admitted to disposing of the gun—does not implicate Samuels at all. Additionally, Surtain's comment that he could "get to" Samuels, whom he did not mention by name, suggests only that Surtain was concerned that Samuels might serve as a witness against him, not that Samuels was himself a participant in the criminal scheme. Similarly, Surtain did not name Samuels as the beneficiary of the insurance policy; rather, Samuels himself admitted this in his opening statement.

In any event, we note also that Bruton has been further limited "to cases where the admission of the incriminating statements was not within a firmly

---

[5] Although Samuels characterizes this as a due process and fair trial issue, we note that Bruton properly is understood to be a Confrontation Clause case. Regardless, as we explain, we find no error under Bruton.

rooted exception to the hearsay rule." United States v. Saks, 964 F.2d 1514, 1525 (5th Cir. 1992). We recently addressed whether a hearsay exception applies in circumstances analogous to those present here. United States v. Ebron, 683 F.3d 105, 132–34 (5th Cir. 2012). In Ebron, two prisoners (Mosley and Ebron) were alleged to have murdered a fellow inmate. Id. at 120–21. A third prisoner (Bailey) testified at Ebron's trial that, while Mosley and Bailey were cellmates, Mosley admitted to him that he and Ebron had committed the murder. Id. at 132–33. On appeal, Ebron maintained that although the statement qualified as a statement against penal interest under Federal Rule of Evidence 804(b)(3) as to Mosley, its admission against Ebron was improper. Id. at 133. We rejected Ebron's argument, however, concluding that "[u]nlike the situation where a declarant implicates himself and the defendant in a statement made to officials, a statement made outside a custodial context does not provide the same set of incentives that create the risk of an unreliable statement." Id. The same is true here. Thus, contrary to Samuels's argument, the district court did not err in admitting Brown's challenged testimony, as the statements at issue qualify under the hearsay exception for statements against penal interest.

For these reasons, we reject Samuels's contention that the district court plainly erred in admitting Brown's testimony. Further, even were we to accept that the court erred, we conclude that Samuels still could not prevail on plain-error review because he is unable to demonstrate that this purported error affected his substantial rights. Even absent the complained-of statements, the evidence of Samuels's guilt was overwhelming.

F.    Trial Severance

Samuels argues that the district court should have severed his trial from that of Moss and Surtain. He did not move for severance at trial, and did not join in his co-defendants' multiple, unsuccessful motions to sever. Samuels thus

contends on appeal that the court should have severed the proceedings sua sponte even though it repeatedly denied his co-defendants' severance motions.

A defendant must move for severance before trial, or show good cause for failing to do so. Fed. R. Crim. P. 12(b)(3)(D), 14(a). Because Samuels has done neither, he has waived this argument. United States v. Cantu-Ramirez, 669 F.3d 619, 624 (5th Cir. 2012).

## G.    Prosecutorial Misconduct

Samuels argues that the prosecutors' conduct rendered his trial fundamentally unfair. He raises three misconduct issues on appeal, contending that the prosecutors (1) repeatedly and improperly asked leading questions; (2) made improper remarks in their closing and rebuttal arguments; and (3) misused a summary witness to recapitulate earlier witnesses' testimony.

In deciding a claim of prosecutorial misconduct, we first "assess whether the prosecutor made an improper remark. If the prosecution has made an improper remark, we must then ask whether the defendant was prejudiced." Ebron, 683 F.3d at 140 (internal citation omitted). Although we usually consider each remark individually, "[t]here may be instances where improper statements, which are not individually prejudicial enough to require reversal, could cumulate to affect the defendant's substantial rights. However, such instances are rare in this circuit." Id. (internal quotation marks and citation omitted). "In considering whether prosecutorial misconduct warrants reversal, the determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." Delgado, 672 F.3d at 334–35 (internal quotation marks and citation omitted).

### 1.    Leading Questions

Federal Rule of Evidence 611(c) provides that "[l]eading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions: (1) on cross-

examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Samuels offers fourteen instances of purportedly improper questioning by the prosecutors, and contends that their cumulative effect was to render his trial fundamentally unfair.

Although it cannot be denied that the prosecutors repeatedly asked leading questions, and that the court admonished them again and again, Samuels has not established that such questioning "cast serious doubt on the correctness of the jury's verdict." Delgado, 672 F.3d at 334–35 (citation omitted). As to most of the instances that Samuels cites, he does not explain how prejudice resulted; ignores that other, properly elicited testimony established the facts he sought to suppress; or fails to mention that the court stopped the improper questioning before the witness responded. Even assuming that the remaining occurrences prejudiced Samuels in some measure, he does not explain whether or how they materially affected the jury's verdict.

Samuels calls our attention to judicial statements respecting the harm that leading questions can cause. United States v. Durham, 645 F.3d 883, 891 (7th Cir. 2011) ("[V]alid concerns regarding the overuse of leading questions exist."); Stine v. Marathon Oil Co., 976 F.2d 254, 266 (5th Cir. 1992) ("[A]ny good trial advocate who is allowed leading questions can both testify for the witness and argue the client's case by the use of leading questions."); United States v. McGovern, 499 F.2d 1140, 1142 (1st Cir. 1974) (leading questions "may supply a 'false memory'" in a friendly witness (citation omitted)). However, he offers no analogous case—indeed, he offers no case at all—in which a judgment of conviction has been reversed based on leading questions. We do not suggest that leading questions never cause reversible error. Before we will grant appellate relief, however, we must be convinced that such questions affected a defendant's substantial rights. Ebron, 683 F.3d at 140. Samuels has not convinced us of this.

2.     Prosecutors' Closing and Rebuttal Arguments

Samuels further contends that, during the prosecutors' closing and rebuttal arguments, they (1) argued facts that were not in evidence and misled the jury, (2) improperly vouched for government witnesses, and (3) improperly attacked the defendants and defense counsel. Because Samuels did not object to the purportedly improper statements, we review for plain error. Id. at 141.

a.     Facts not in Evidence

In discussing Samuels's role in the Landry house fire, the prosecutor stated: "And you recall Mr. Samuels who testified, obviously, before lunch, talking about this is some kind of an electrical fire. . . . But you see, con men, they think they can convince people. That was an arson." Samuels contends that he never offered such testimony. In fact, Samuels testified that Landry had burned down his own house and blamed faulty electrical wiring. The prosecutor thus appears to have misunderstood or misremembered Samuels's testimony in a way that made Samuels appear to be dishonest. This mistake did not affect the integrity of the proceedings, however. As we will explain, witness credibility was a main point of contention in closing arguments, and ample evidence permitted the jury to infer that Samuels had offered false testimony.

In discussing the van fire, the prosecutor stated that a New Orleans fire investigator said the van had been moved away from Samuels's house to keep the house from catching fire and to place the van in full view of the security camera, thus aiding his alibi. As Samuels concedes, the investigator testified that the security camera captured the arson on tape, and that the house would have been damaged if the van had been parked closer to it. Although it is true that the investigator did not say these were Samuels's reasons for parking the van where he did, the jury could have made this reasonable inference based on the investigator's testimony.

On rebuttal, the prosecutor criticized Samuels for allowing Surtain—his sister's ex-boyfriend—to live in his apartment even though his sister bore ill will toward him following their break-up. The government thus suggested that Samuels would not have permitted Surtain to stay with him but for Surtain's assistance in August's murder. Samuels contends that none of the trial evidence revealed Maria Samuels's feelings about her relationship with Surtain. However, Samuels's cross-examination testimony established that Maria's relationship with Surtain ended, and that she gave their baby to her parents. Samuels sought to justify his continuing relationship with Surtain by noting that Surtain remained his niece's father. Accordingly, although the prosecutor's rebuttal statement did not perfectly characterize the evidence, neither was it unfairly prejudicial.

Finally, the prosecutor sought to discredit Samuels's alibi—his presence at church while Moss and Surtain were dealing with August—by stating that "[t]his guy went to church for the first time in [his] life, while this guy drove his van to lure him out so he could be killed." In the context of the entire proceeding, a reasonable jury would have recognized that this statement was not meant to represent facts in evidence. Samuels's apparent modus operandi throughout the events recounted at trial was to establish alibis to distance himself from the crimes he had planned: He was at a church service while Surtain was killing August, was away from his home while others set his van on fire, and had instructed Landry to visit a client while Moss was setting fire to his house. Further, he appeared to play up his involvement in church activities—he testified that his great, great grandfather had founded the church, and that he had reminded his mother to retrieve a robe they were to give their minister. Accordingly, a reasonable juror would have recognized the prosecutor's hyperbolic statement as an attack on Samuels's credibility. See Ebron, 683 F.3d at 143 ("[T]he use of colorful pejoratives is not improper.").

### b.    Vouching

Samuels contends that the prosecutor improperly vouched for government witnesses' credibility, including that of ATF agents Robert Stoltz and Wyatt Evans, and Samuels's cooperating co-defendants. "[A] personal assertion by a prosecutor of a government witness's credibility is impermissible." United States v. Gracia, 522 F.3d 597, 601 (5th Cir. 2008). Personal vouching does not necessarily constitute reversible error, however. "The test for improper vouching for the credibility of a witness is whether the prosecutor's expression might reasonably lead the jury to believe that there is other evidence, unknown or unavailable to the jury, on which the prosecutor was convinced of the accused's guilt." United States v. McCann, 613 F.3d 486, 495 (5th Cir. 2010) (internal quotation marks and citation omitted).

> As to Stoltz and Evans, the prosecutor stated:

> And these two phenomenal agents, Bobby Stoltz and Wyatt Evans, they went backwards. They went to the Augusts. "Hmm, insurance. Let's dig a little deeper." That led to Stefan James, and that led to this prosecution. Just phenomenal work that you saw over the last week. . . . [W]e put on a compelling case, thanks to those two gentlemen right here.

Samuels argues that the prosecutor thus "wrapp[ed] his witnesses in the government's cloak of veracity and invok[ed] his personal status as the government's attorney to assure the jury of the credibility of those agents." Gracia, 522 F.3d at 606–07. We disagree. The prosecutor's comments that Stoltz and Evans were "phenomenal" and did "phenomenal work" appear to have been based on his description of their investigation. Further, he did not specifically refer to their credibility as witnesses. Accordingly, we do not believe that a jury indisputably would have believed the prosecutor's comments were based on evidence not offered at trial. See McCann, 613 F.3d at 495.

As to the cooperating witnesses, the prosecutor stated in rebuttal:

Why in the world would someone come in and tell the truth about themselves, go in and plead guilty before this Court, be facing an enormous amount of penalties, and then start lying about somebody else? In hopes – in hopes – that they can bamboozle the judge who will then say, "If the government gets bamboozled, oh, I'm going to grant a reduction." It makes no sense.

* * *

Well, you put yourself in all those witnesses' shoes with these cowboys, with these dudes, and you decide whether or not you are at risk.

Orlando [Brown], who will be in jail for a long time; Stefan [James], who will be in jail for a long time; Damian [Landry], who will be in jail for a long time; the family members, your family members, your wife, your brother, your aunt. You decide whether or not there is any risk, if it's all cotton. That you have the hope, maybe, hopefully, that a judge will give you a decent sentence versus whether or not these guys will.

Although a prosecutor "cannot express a personal opinion on the credibility of witnesses," he or she "may argue fair inferences from the evidence that a witness has no motive to lie." Gracia, 522 F.3d at 601. From the above statements, we perceive no personal vouching for the cooperating witnesses' credibility. In each of these statements, the government fairly implied, based on record evidence, that the witnesses had strong motives not to lie. Moreover, the prosecutor made these comments on rebuttal to counter specific attacks defense counsel had made on the witnesses' credibility. Bolstering is permitted in such circumstances. McCann, 613 F.3d at 495.

Relying on one of our previous cases, Samuels nevertheless argues that reversible error occurred. In Gracia, four of the prosecutor's statements were at issue: (1) He stated that border patrol agents who had testified at trial were "very, very credible"; (2) he asked the jury whether an agent "who has worked as a law enforcement agent for many years, that is his career, that is his chosen life, a man from this area, a man with a family . . . would throw all that away by

taking this stand and taking an oath and lying to you to get Mr. Gracia"; (3) he urged the jury "to respect [the agents'] efforts as law enforcement officials and to believe the testimony that they offered"; and (4) he stated that "to acquit Gracia, [the jury] would have to believe that the agents 'got out of bed' on the day they arrested Gracia and decided that this was 'the day that [they] were going to start [a] conspiracy to wrongfully convict Mr. Gracia.'" 522 F.3d at 600 (third and fourth alterations in original). On plain-error review, we reversed the defendant's conviction because each of these statements urged conviction based on "something uniquely within the prosecutor's knowledge." Id. at 601. As we have discussed, however, the prosecutor in the instant matter made fair inferences respecting the witnesses' credibility, and referred to the record evidence on which his statements were based. Accordingly, Samuels's reliance on Gracia is misplaced.

### c. Character Attacks

Samuels argues that the prosecutors improperly called him a "con man" and a "liar," and made inappropriate remarks about defense counsel:

But you see, con men, they think they can convince people.

* * *

You see, all that was designed to do, Mr. Con Man, you see, it's a preemptive strike . . . .

They have lied every chance that they got so that they can try to bamboozle you.

* * *

[Defense counsel] forgot to talk about [Samuels's] performance up there. Because you had the opportunity to listen to two hours of fabrication. It's a pathological liar. A guy that had an answer, and a bad answer, for everything. Even when he looked at himself telling the 1,001 lie[s] to the agents in April of 2009 . . . . He can't keep a story straight . . . .

And that's the benefit of you being able to watch somebody on the witness stand. Because you really did get to see a master – I'm not saying he's not a master. But you got to see a pathological liar.

* * *

He can connive.

The prosecutor also attacked defense counsel's arguments as "defense lawyer myths" and "ultimate lawyering."

"A prosecutor may not go beyond the evidence and attack a defendant's character or veracity." Delgado, 672 F.3d at 336. In the instant matter, the government relied heavily on cooperating witnesses' testimony, and Samuels's defense hinged on the testimony he offered to establish that the government had gotten the wrong man. Witness credibility thus became a point of contention in both sides' closing arguments; defense counsel attacked government witnesses' truthfulness just as much as the government attacked Samuels's.

As we have recently discussed, "[i]mproper assertion of a prosecutor's personal opinion is easily recognized. . . . [I]t includes personal expressions such as 'I think,' 'I know,' 'I believe,' or other expressions that either explicitly or implicitly convey the prosecutor's personal impressions." Id. at 336–37 (internal quotation marks and citations omitted). The prosecutor in the instant matter did not employ such phrases or otherwise squarely imply that he was offering credibility assessments not based on trial evidence. Indeed, each of the purportedly improper statements Samuels cites was couched in evidence that tended to show he had lied or sought to mislead others on specific occasions. "While the prosecutor should have chosen his words more carefully, his argument differs from improper argument in that its meaning and effect would have been no different had he simply added the words 'As I've explained, the evidence shows' before stating that [Samuels] had lied." Id. at 337.

The prosecutor's comments about "defense lawyer myths" and "ultimate lawyering" were also made in the context of a battle over witness credibility.

Fairly construed, these were attacks on defense counsel's arguments, not personal attacks against the defendants' attorneys. Accordingly, these comments were not improper.

On plain-error review, we cannot say that the prosecutor's comments in closing and rebuttal arguments affected Samuels's substantial rights or "cast serious doubt on the correctness of the jury's verdict." Ebron, 683 F.3d at 140 (citation omitted); Delgado, 672 F.3d at 334–35. Accordingly, we will not reverse Samuels's convictions on this basis.

3.    Summary Witness Testimony

The government's final witness was New Orleans police detective and ATF task force officer Robert Stoltz. Much of his testimony concerned the records of phone calls from, to, and between the defendants. Samuels argues that the government improperly used Stoltz's testimony to recapitulate earlier government witnesses' testimony, in effect offering a "supplemental closing argument." He notes five instances in which Stoltz testified that earlier witnesses had confirmed their association with certain phone numbers or discussed the timing of certain calls.

Samuels also complains that the government asked ATF agent Wyatt Evans about Damian Landry's testimony respecting money he said he had given Samuels. Evans testified that Landry had not said he gave Samuels insurance money, but had instead given Samuels money from his tax refund.

The evidentiary rule respecting summary witnesses "does not contemplate summarization of live testimony presented in court." United States v. Nguyen, 504 F.3d 561, 572 (5th Cir. 2007) (citation omitted). "Summary witnesses may not be used as a substitute for, or a supplement to, closing argument." Id. (internal quotation marks and citation omitted).

Assuming, arguendo, that these witnesses' recapitulation of prior testimony constituted error, we do not agree that it affected Samuels's

44

substantial rights or "seriously affect[ed] the fairness, integrity, or public reputation of" his trial. Hebron, 684 F.3d at 558. The witnesses made minor references to other witnesses' statements; this made up a trifling part of their overall testimony. Their testimony thus did not constitute "supplemental closing arguments," and reversal is not justified on this basis.

## H.     Samuels's Sentence

Samuels also argues that his sentence was procedurally unreasonable and violated his Sixth Amendment right to trial by jury and Fifth Amendment right to due process. Specifically, he contends that although he was not charged with, and the jury did not find him guilty of, August's murder, his offense level under the Sentencing Guidelines was driven primarily by this supposedly unproven offense conduct.[6] Because Samuels did not raise this objection at sentencing, we review his sentence for plain error. United States v. Peltier, 505 F.3d 389, 392 (5th Cir. 2007).

Although Samuels was initially sentenced to 900 months' imprisonment, we have ordered that his sentences on Counts 12 and 13 be vacated on multiplicity grounds, and that a sentence be imposed as to only one of these counts. These use-of-fire sentences (and the sentence that must be reimposed on remand) are mandatory and inflexible, and are to be served consecutively to any other term of imprisonment. 18 U.S.C. § 844 (h)(1). Further, although we have also vacated Samuels's conviction on Count 4, this offense was grouped with

---

[6] Samuels further contends that he could not fully defend himself because substantial evidence was washed away by Hurricane Katrina. Samuels does not elaborate on what "substantial evidence" was lost, and his record citations are uninstructive or irrelevant.

He also argues that because he was not charged with August's murder after New Orleans police investigated the matter, there must not have been enough evidence to support a murder conviction. We are not concerned with what evidence was available to New Orleans police at that time, nor what evidence would be required for a murder conviction under Louisiana law. Samuels ignores that the trial evidence presented in the instant matter overwhelmingly proved that, as alleged in the superseding indictment, he had August killed for insurance money.

Counts 1 through 11 and 15, see U.S.S.G. § 3D1.2(c), and the sentence for that count is to run concurrently with each of the still-valid sentences on Counts 2 through 11. Because Samuels's challenge essentially goes to his Guidelines offense level, which remains the same even absent the Count 4, 12, and 13 convictions (and thus is not affected by our mandate respecting these counts), we will address his Guidelines argument in the interest of judicial efficiency. See United States v. Magdaleno-Sanchez, 169 F. App'x 830, 831 (5th Cir. 2006) (unpublished) (per curiam) (addressing Guidelines argument "in the interest of judicial efficiency and to provide guidance on remand" even though the defendant's sentence had already been vacated on other grounds). We conclude that no error arose from Samuels's sentence.

Samuels correctly notes that he was not separately charged with murder in this matter. He was, however, convicted of conspiracy to commit mail and wire fraud under Count 1. The government alleged in that count that Samuels fraudulently obtained insurance on August's life and then had him murdered, and offered ample evidence proving as much. The district court thus applied § 2B1.1(c)(3) of the Sentencing Guidelines, which provides that where "the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally . . . [and] the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct), [the court should] apply that other guideline." U.S.S.G. § 2B1.1(c)(3) (2010).

The district court then correctly applied § 2A1.1 (First Degree Murder), the practical effect of which was a twenty-one-step increase in Samuels's offense level. His Criminal History Category of IV and offense level of forty-seven rendered an advisory Guidelines sentencing range of life imprisonment. Absent § 2A1.1's application, and assuming that no further adjustments would have applied to Samuels's offense level, his advisory sentencing range would have

been 92 to 115 months. Nonetheless, the Guidelines portion of his sentence—that is, the portion not affected by the three mandatory consecutive sentences imposed under 18 U.S.C. § 844(h)(1)—was limited by statutory maximum sentences. 18 U.S.C. §§ 371, 1001, 1341, 1343. This part of the overall sentence amounted to twenty-five years' imprisonment. See id. §§ 3553(a), 3584(b) (setting out the factors to consider in determining whether sentences should run concurrently or consecutively). The three mandatory § 844(h)(1) sentences increased his overall sentence to seventy-five years' imprisonment.

Relying on dicta in one of our prior cases, Samuels argues that this is a "case[] where a sentencing fact [(i.e., August's murder)] is a 'tail that wags the dog of the substantive offense,' and might arguably require a finding beyond a reasonable doubt." United States v. Mergerson, 4 F.3d 337, 344 (5th Cir. 1993) (quoting McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986)). We recently explained that we "ha[ve] never required such a heightened burden" for offense conduct findings, and our sister circuits have rejected it as well. United States v. Brooks, 681 F.3d 678, 713 & n.31 (5th Cir. 2012). Accordingly, the district court did not plainly err in applying the preponderance standard for Guidelines purposes. See United States v. Setser, 568 F.3d 482, 498 (5th Cir. 2009).

Even if a heightened standard applied, however, we would not reverse Samuels's conviction. Remarkably, Samuels contends that August's homicide and Samuels's role in it were "unproven." Once again, the government alleged that, in satisfaction of the conspiracy count's "overt act" requirement, Samuels agreed to pay Surtain to kill August, and that Surtain fatally shot August on April 24, 2004. As outlined above, the government offered an overwhelming amount of evidence establishing that Samuels had August killed to obtain life insurance proceeds, and certainly enough to satisfy the reasonable doubt standard for purposes of the conspiracy count and the first-degree murder sentencing guideline. U.S.S.G. § 2A1.1; see also 18 U.S.C. § 1111 ("Murder is the

unlawful killing of a human being with malice aforethought. Every murder perpetrated by any . . . kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree.").

## III. CONCLUSION

For the foregoing reasons, we VACATE Samuels's sentences on Counts 12 and 13 of the superseding indictment, REMAND for reversal by the district court of his conviction on one of these counts (at the government's election) and dismissal of that count, and order resentencing on the remaining count. We deem the judgment of conviction on the remaining count AFFIRMED. We VACATE Samuels's conviction on Count 4 of the superseding indictment. In all other respects, we AFFIRM the district court's judgment.

JAMES E. GRAVES, JR., Circuit Judge, concurring in part and dissenting in part:

I concur with the majority in all respects except for its affirmance of the conviction of Charles Moss and Jermaine Surtain on Count 12 for aiding and abetting the use of fire to commit obstruction of justice.

The jury instruction on Count 12 requires that, to convict, the jury must find beyond a reasonable doubt that the defendant "knowingly caused the use of fire to alter, destroy, mutilate, or conceal a record, document, or other object, or attempted to do so, with the intent to impair the object[']s integrity or availability for use in an official proceeding, or otherwise obstruct, influence, or impede any official proceeding." The jury instruction then lists the four elements of a charge of aiding and abetting, which was the charge Moss and Surtain were facing in relation to Count 12:

> For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> 1. That . . . the offense charged . . . was committed by some person;
>
> 2. That the defendant associated with the criminal venture;
>
> 3. That the defendant purposefully participated in the criminal venture; and
>
> 4. That the defendant sought by action to make that venture successful.

The jury instruction further explains: "The term 'to associate with the criminal venture' means that the defendant shared the criminal intent of the principal. This element cannot be established if the defendant had no knowledge of the principal's criminal venture." And "[t]he term 'to participate in the criminal venture' means that the defendant engaged in some affirmative conduct designed to aid the venture or assisted the principal of the crime."

The majority's opinion is correct that inferences supported by circumstantial evidence can satisfy the elements of a crime, but those inferences

must be reasonable. United States v. Moreland, 665 F.3d 137, 149 (5th Cir. 2011) (quotation omitted) ("We [] will draw upon only reasonable inferences from the evidence to support the verdict."). "Courts cannot credit inferences within the realm of possibility when those inferences are unreasonable." Id. (quotation omitted). Moreover, we "uphold the verdict if, but only if, a rational juror could have found each element of the offense beyond a reasonable doubt." Id. at 155 (quotation omitted). "A verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." Id. at 149 (quotation omitted).

With respect to the four elements of the aiding and abetting charge for Count 12, the first element is easily satisfied. David Samuels along with two unidentified individuals committed the underlying offense of burning the van to obstruct justice.

Regarding the second element, "associating with the criminal venture," a reasonable jury would have to infer that Moss and Surtain had knowledge of and shared in Samuels's criminal intent, and had a motive to burn the van. I agree that circumstantial evidence supports the inference that Moss and Surtain both knew about Samuels's van burning scheme and shared his motive—to destroy evidence of Treyor Winston August's murder.[1]

The third and fourth elements, however, are more troublesome. The third element requires that Moss and Surtain engaged in some affirmative conduct to aid or assist Samuels in the burning of the van. The majority, citing United States v. Gulley, 526 F.3d 809, 816 (5th Cir. 2008), properly notes that mere encouragement is sufficient to "aid or assist." The fourth element requires that Moss and Surtain sought by action to make the van burning successful. The content of the phone calls between Moss and Samuels, and Surtain and Samuels

---

[1] It is immaterial here that Samuels had an additional motive of collecting the insurance payout for the destroyed van.

on the day and night of the van fire are unknown. Therefore, to properly find Moss and Surtain guilty beyond a reasonable doubt on the third and fourth elements, a jury would have to make two additional inferences: that the three were discussing the burning of the van during those calls; and that during those calls, Moss and Surtain aided or encouraged Samuels in setting the van ablaze.

I agree that a reasonable jury, based on circumstantial evidence, could have made the second inference regarding the likely content of the phone calls. Nevertheless, the third inference—that Moss and Surtain aided or encouraged Samuels—is a prime example of "speculation, [] conjecture, or an overly attenuated piling of inference on inference." Moreland, 665 F.3d at 149. This inference is not tethered to any circumstantial evidence, and is therefore unreasonable. I cannot accept the majority's ruling that a rational juror could have found beyond a reasonable doubt that Surtain and Moss encouraged Samuels to burn the van during the calls or that Samuels sought Moss's advice on how to burn the van since Moss was the so-called go-to man on incendiary devices. The record is clear that Samuels was the ringleader and organizer of every criminal scheme. Based on the history of the three's interactions, it is indeed more likely that Samuels was instructing Surtain and Moss during those calls, informing them of his plan to burn the van and what the others should do next.

Because a reasonable jury could not have found Moss and Surtain guilty beyond a reasonable doubt on the last two elements of the aiding and abetting charge, I dissent from the majority's affirmance of the conviction of Moss and Surtain on Count 12.